Luella Elizabeth THOMPSON, Appellant,

v.

The ESTATE OF Raymond Paul PETROFF and Marlene Campbell, authorized representative, Respondents.

No. 81–848.

Supreme Court of Minnesota.

May 21, 1982.

Allan Swen Anderson, Granite Falls, for appellant.

Joseph Kaminsky, Douglas Peine, Minneapolis, for respondents.

AMDAHL, Chief Justice.

This is an appeal by Luella Elizabeth Thompson from an order of the District Court for the Eighth Judicial District, Yellow Medicine County, granting a motion for summary judgment made by respondents, the estate of Raymond Paul Petroff, and its personal representative.

Luella Thompson, who had been a widow since 1974, was 60 years old at the time of the incident giving rise to this action. In 1976 she began seeing the decedent, age 43, on a regular basis; their relationship continued until November of 1977. Thereafter they had no significant contacts with each other until November 16, 1979.

On that date, Petroff went to Thompson's house, entered without knocking, and told Thompson that he "wanted to talk." After he and Thompson had watched television together for several hours, he told her that he wished to resume their relationship. Thompson refused to do so, and acknowledged the truth of a rumor that she was planning to travel to the Middle East and marry an "Arab gentleman." Petroff became angry and refused to leave Thompson's house and to allow her to leave. He tried to force her to have oral sex with him but was unsuccessful. Thompson grabbed a kitchen knife with which to defend herself, but Petroff was able to corner her in the bedroom, where he cut her with the knife, raped her, and twice threatened to kill her. Immediately following the rape, Thompson managed to get ahold of a revolver that she had loaded and placed under the bed several months earlier. She pointed the gun at Petroff and told him to get out of the house. Petroff lunged toward the gun, striking it with his hand. The gun discharged, killing him.

Thompson was arrested and charged with murder in the third degree and second-degree manslaughter, and was tried on July 8–16, 1980, before the court, sitting without a jury. She was acquitted of all charges, the court finding that she acted in self-defense. Following her acquittal, she brought this action against Petroff's estate for compensatory and punitive damages. The es-

tate moved for, and was granted, summary judgment on the ground that under Minn. Stat. § 573.01 (1980) an intentional tort action does not survive the death of the tortfeasor. Thompson appealed, contending that the survival statute violates the equal protection provisions of the state and federal constitutions.

1. Survival statutes rarely have been the subject of constitutional challenges,[1] and in only one other state, Pennsylvania, has a survival statute been declared unconstitutional because a particular cause of action had been excluded.[2] *Moyer v. Phillips,* 462 Pa. 395, 341 A.2d 441 (1975). The Minnesota survival statute, Minn.Stat. § 573.01 (1980), provides:

> A cause of action arising out of an injury to the person dies with the person of the party in whose favor it exists, except as provided in section 573.02. It also dies with the person against whom it exists, *except a cause of action arising out of bodily injuries or death caused by the negligence of a decedent or based upon strict liability, statutory liability or breach of warranty of a decedent, survives against his personal representatives.* All other causes of action by one against another, whether arising on contract or not, survive to the personal representatives of the former and against those of the latter.

*Id.* (emphasis added). The statute precludes the victim of any personal injury other than those specified from bringing an action against the estate of a deceased tortfeasor. Thompson contends that the exclusion of intentional torts from the survival

statute operates as an unconstitutional denial of equal protection. She argues that no rational basis exists for legislatively distinguishing between persons whose cause of action is based upon an unintentional injury and one whose action arises from an intentional tort.

At common law all causes of action died with the actors. *See* W. Prosser, *Handbook of the Law of Torts* 898 (4th ed. 1971). Although the origin of the rule *actio personalis moritur cum persona* is uncertain, it appears that it was originally based upon the fact that those acts now classified as torts were at one time dealt with as crimes. *See id.* At early common law no cause of action in tort in the modern sense existed.[3] By the 13th century, a wrongdoer was dealt with by means of the appeal of felony. At that time, a felony was a crime that could be prosecuted by an accusation in which the accuser was required to offer battle. The felon was likely to forfeit life or limb and his lands and goods would be confiscated by the king. 2 F. Pollock & F. Maitland, *The History of English Law* 466 (2d ed. 1898). No clear distinction was made, at least with respect to the punishment visited upon the wrongdoer, between civil and criminal actions. Because these early actions were intended more to punish the wrongdoer than to compensate the victim, the rule evolved that no one other than the wrongdoer should suffer for his misdeeds. This rule apparently was well established by the middle of the 13th century, when Bracton wrote:

> In [obligations arising from] *delicta* or *maleficia,* [where] the delinquent is bound

**1.** *See Stanley v. Petherbridge,* 96 Colo. 293, 42 P.2d 609 (1935), *overruled on other grounds, Publix Cab Co. v. Colorado Nat. Bank,* 139 Colo. 205, 338 P.2d 702 (1959); *Nadstarek v. Trask,* 130 Or. 669, 281 P. 840 (1929).

**2.** In *Belkner v. Preston,* 115 N.H. 15, 332 A.2d 168 (1975), the New Hampshire Supreme Court declared unconstitutional a section of that state's survival statute on other grounds. The statute provided that an action must be brought before the end of the second court term after the original plaintiff's death. It was declared unconstitutional on the ground that because some counties had more court terms

per year than others, the limitation period would vary according to the county in which the action was brought. *Id.* at 20, 332 A.2d 171.

**3.** The only compensation an injured party was likely to receive under Anglo-Saxon law was called *bot,* meaning betterment, which was based on a complicated tariff. Each kind of injury had its price, and a wrongdoer could buy back the peace he had broken only by paying *bot* to the victim and a *wite* to the king. 2 F. Pollock & F. Maitland, *The History of English Law* 451 (2d ed. 1898).

to him against whom he has offended, the obligation is not extinguished with regard to the penalty except by the death of both or the other of the two parties. Punishment is not to be extended beyond the person of the offender, for he who is not at fault ought not to suffer punishment.

2 *Bracton on the Laws and Customs of England* 290 (S. Thorne trans. 1968).

According to some authorities, the appeal of felony eventually evolved into the writs of trespass.[4] *See* 2 F. Pollock & F. Maitland, *supra*, at 511–12, 526; W. Prosser, *supra*, at 898. Whatever its origin, it is apparent that trespass retained a strong quasi-criminal character.[5] In the earlier trespass cases, compensatory damages in the modern sense were almost unknown; the defendant usually would be required to pay an amount fixed by law rather than compensation for the plaintiff's actual injuries. *See* 2 F. Pollock & F. Maitland, *supra*, at 522–23. The nature of the trespass actions remained essentially punitive even as courts began to award actual damages, and the rule prohibiting the survival of such causes of action was retained. *See* Winfield, *Death as Affecting Liability in Tort*, 29 Colum.L.Rev. 239, 242 (1929). It was modified by statute during the reign of Edward III to permit causes of action for the loss, damage or conversion of personal property to survive the death of the plaintiff. *See* 4 Edw. 3 ch. 7 (1330); 25 Edw. 3, st. 5, ch. 5 (1351). Courts continued to hold, however, that "where the hurt or damage is corporal, as if a man beat me and die, my action is gone, or if I die my executors shall not have an action, for the party cannot be punished when he is dead." Y. B. Mich. 12 Hen. 8, f. 11, pl. 3 (1521); *see* Winfield, *supra*, at 245.

American courts, following the English rule as it existed in the 14th century, did not recognize the survival of actions for torts against real property, torts affecting the person, whether the injury was negligently or intentionally inflicted, or those involving injuries to interests of personality, such as defamation and malicious prosecution. *See* W. Prosser, *supra*, at 899–900. To alleviate the rule's often harsh results, state legislatures began in the 19th century to enact statutes that created a variety of exceptions to the rule.[6] *See id.* at 900–01.

The history of the Minnesota survival statute is set forth in *Lavalle v. Kaupp*, 240 Minn. 360, 61 N.W.2d 228 (1953), in which we held that the version of the statute then in effect permitted only causes of action based on negligence to survive the death of the defendant. We outlined the statute's background as follows:

> Our original survival statute, Pub.Stat. 1849–1858, c. 68, §§ 1 and 2, which was taken verbatim from our territorial statutes, R.S.1851, c. 78, §§ 1 and 2 provided that a cause of action arising out of injury to the person died with the person of either party except as provided in the wrongful death act. The original statute was first amended in 1866, G.S.1866, c. 77, § 1, by striking out the explanatory clause at the end of the second section * * *. With this minor amendment the original act remained in full force and effect as declaratory of the common-law rule governing the abatement and the survival of causes of action for personal injuries.

*e.g., Thomas of Chatham v. Benet of Stamford*, Y.B. 6 Edw. 2, (1313), *reprinted in* V Year Books Series 185 (Selden Society 1909).

---

**4.** At least one other authority strenuously disagrees, proposing instead that trespass originally was based upon injuries to land rather than to the person, and that the writs of trespass evolved as a result of the frequently violent attempts at disseisin. *See* C. Fifoot, *History and Sources of the Common Law: Tort and Contract* 44–47, 50–51 (1949).

**5.** The defendant in an action in trespass *cum vi et armis* might not only be forced to pay the plaintiff, but could be imprisoned and required to forfeit all of his property to the king. *See,*

**6.** Almost all statutes permit causes of action for injuries to property to survive, and many allow the survival of other nonpersonal injuries. Approximately one-half of the states permit the survival of certain personal injury actions. *See* W. Prosser, *Handbook of the Law of Torts* § 127, at 900 (4th ed. 1971).

It was not until 1941 that the statute was again amended, L.1941, c. 440, § 1, and then for the first time we have a specific change in the provision that all causes of action for personal injuries die with the person of either party. In that year, the Minnesota State Bar Association sponsored a bill which, had it been adopted, would have provided that any cause of action arising out of injuries to the person would survive the person against whom the cause of action arose. This amendatory bill in its sweeping form was not adopted by the legislature until it was specifically changed by limiting the provision for the survival of all personal injury causes so that it would apply only to those causes growing out of personal injuries *which are the result of the negligence of the decedent.* As thus amended, L.1941, c. 440, § 1, we have the statute in its present form. § 573.01. The action of the legislature in this case was clearly indicative of a deliberate intent that a cause of action arising out of personal injuries should continue to die with the person against whom it existed *except when such personal injuries are caused by decedent's negligence.*

*Id.* at 361–63, 61 N.W.2d at 229–30 (emphasis in original). In 1967, the legislature extended surviving causes of action to include actions "based upon strict liability, statutory liability or breach of warranty." *See* Act of Apr. 12, 1967, ch. 158, § 1, 1967 Minn.Laws 282, 283 (codified at Minn.Stat. § 573.01 (1980)). In *Wild v. Rarig,* 302 Minn. 419, 234 N.W.2d 775 (1975), *cert. denied,* 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976), we remarked that "it would appear that" the survival statute did not apply to intentional torts such as assault, battery, and false imprisonment. *Id.* at 446, 234 N.W.2d at 792–93. Respondents argue that the above cases control the result in this case. We disagree. To establish that the legislature may have intended a certain result does not answer the question of whether the legislature acted rationally. Both *Lavalle* and *Wild* dealt only with statutory interpretation, not with a constitutional challenge; here we must go beyond the legislature's intent and consider the basis of the legislature's classification.

Appellant does not argue that we should apply any higher standard of review than the rational basis standard. In *Guilliams v. Commissioner of Revenue,* 299 N.W.2d 138 (Minn.1980), we listed three factors that must be satisfied if a statute is to be upheld under this standard:

(1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is, there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*Id.* at 142 (*quoting Miller Brewing Co. v. State,* 284 N.W.2d 353, 356 (Minn.1979)).

Respondents contend that the rational basis underlying the statute involves the differences of proof required to establish negligence and to establish intent. They argue that the defendant's estate is at a disadvantage if the defendant is absent since intent, as well as defenses such as consent or provocation, would be more difficult to prove without the defendant's testimony. Intent to do a particular act is one of the most important issues in an action for assault and battery. *Brown v. State Automobile & Casualty Underwriters,* 293 N.W.2d 822, 825 (Minn.1980). · What the defendant intended to do is obviously a subjective matter that could be more easily proved if he were available to testify. Prosser points out, however, that "no serious difficulties [with respect to proof] have arisen as to contract actions and those torts which now survive." W. Prosser, *supra,* at 901.

Some causes of action have been held to survive because they involve property rights or are closely related to claims arising out of contract. For example, this

court has indicated that the tort of wrongful interference probably would survive under section 573.01 "because it resembles a property or a contract claim." *Wild v. Rarig*, 302 Minn. at 446, 234 N.W.2d at 793. Nevertheless, the tort of wrongful interference is clearly an intentional rather than a negligent act, *see* Restatement (Second) of Torts ch. 37, Introductory Note (1977); certainly the defendant's state of mind in such a case is relevant in much the same manner as in intentional torts causing personal injury. In another case, *Hunt v. Authier*, 28 Cal.2d 288, 169 P.2d 913 (1946), the court permitted the widow of a man who had been intentionally killed by a person who then committed suicide to bring an action against the murderer's estate on the ground that the widow had a property right in her deceased husband's income. *Id.* at 296, 169 P.2d at 918 (1946). That courts can fashion and justify such exceptions as these in order to permit a cause of action to survive demonstrates the speciousness of respondents' contention that difficulties of proving the deceased defendant's state of mind provides a rational basis for the exclusion of intentional torts from the survival statute. Certainly the purported existence of a property right or a contractual relationship does nothing to alleviate proof problems.

In *Moyer v. Phillips*, 462 Pa. 395, 341 A.2d 441 (1975), the Pennsylvania Supreme Court declared that state's survival statute[7] unconstitutional on the ground that the exception of defamation from the statute was a denial of equal protection. The court's conclusion was based upon its perception of the "remedial" nature of survival legislation— that is, that survival statutes were designed in accordance with modern theories of tort law, which stress the compensatory rather than the punitive aspects of damages for any injury. *See id.* at 401, 341 A.2d at 443–45. The court concluded that the restoration of the plaintiff's reputation was the most important function of a defamation action. *Id.* at 401, 341 A.2d at 444. Accordingly, it held that "any distinction, for purposes of survival, which differentiates libel and slander from other actions is arbitrary," and serves no function of the statute or of the law of defamation. *Id.* at 403, 341 A.2d at 444–45.

We do not believe that prohibiting the survival of intentional tort causes of action serves any purpose of modern tort law. Under modern tort theory, the primary reason for the existence of a cause of action is to provide a means of compensation for the injured victim. "[T]he general purpose of the law of torts is to secure a man indemnity against certain forms of harm to person, reputation, or estate, at the hands of his neighbors, not because they are wrong, but because they are harms." O. W. Holmes, *The Common Law* 115 (M. Howe ed. 1963). Intentional torts have been omitted from the survival statute for no apparent reason other than the legislature's failure to keep up with the development of modern tort law. The old rule of nonsurvival was based on medieval notions of revenge that no longer have a place in our law;[8] since compensation rather than punishment is now the essential purpose of any tort cause of action, there seems to be little reason to exclude only those that evolved from the punitive, quasi-criminal trespass writs and the even more ancient appeal of felony. It is clear that difficulties of proving a decedent's intent provide no basis for the exclusion since certain other causes of action in

---

7. This statute provided that "[a]ll causes of action or proceedings, real or personal, except actions for slander or libel, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants." Pa.Stat.Ann. tit. 20, § 3371 (Purdon Supp. 1975).

8. Sir Frederick Pollock has called the nonsurvival rule "one of the least rational parts of [English] law," which has been made at all tolerable for a civilized country only by a series of exceptions." F. Pollock, *The Law of Torts* 53–54 & nn. c, h (14th ed. 1939). Prosser points out that "the modern trend is * * * that tort causes of action and liabilities are as fairly a part of the estate of either plaintiff or defendant as contract debts, and that the question is rather one of why a fortuitous event such as death should extinguish a valid action." W. Prosser, *Handbook of the Law of Torts* 901 (4th ed. 1971).

which intent is an issue have been permitted to survive.[9]

In *Wegan v. Village of Lexington*, 309 N.W.2d 273 (Minn.1981), we held that the notice of claim and commencement of suit provisions of the Minnesota Civil Damages Act that distinguished between 3.2 beer and other liquor violated the equal protection clause of the United States and Minnesota Constitutions. Applying the three-factor test enunciated in *Guilliams v. Commissioner of Revenue*, we concluded that:

> The statute is fatally defective * * * because it cannot satisfy *Guilliams*' first and second factors. The classifications (sale of 3.2 beer versus sale of intoxicating liquor) are not genuine or relevant to the purpose of the law. Moreover, the distinctions which separate those included within the classification from those excluded are manifestly arbitrary and fanciful. Because prohibition was repealed almost half a century ago, the legislative distinctions between 3.2 beer and intoxicating liquor are based, at best, upon historical anachronisms.

309 N.W.2d at 280. Under this analysis, the survival statute is defective as well. The third factor—that the purpose of the statute is one the state may attempt to achieve—is satisfied. The purpose of the statute was to alleviate in part the harsh results of the common law rule prohibiting the survival of any cause of action. This is clearly a legitimate governmental purpose. The first and second factors, however, are not satisfied. The distinction between intentional torts and other causes of action is not relevant to the purpose of the statute, and the classifications (victims of deceased negligent tortfeasors and victims of deceased intentional tortfeasors) are arbitrary in light of the development of modern tort law. Furthermore, if the original purpose of the survival statute was to abrogate the harsh common-law rule, it is illogical to exclude from the statute only the torts that evolved from the trespass writs. In *Wegan*, we commented that the statute in question in that case was based on "historical anachronisms." *Id.* Those anachronisms date only from 1933; the anachronism in the instant case is a throwback to the 12th century. Although we recognize, and have held, that a statute is presumed to be constitutional, *see Guilliams v. Commissioner of Revenue*, 299 N.W.2d 138, 142 (Minn. 1980), and will be overturned "only when absolutely necessary," *Schwartz v. Talmo*, 295 Minn. 356, 205 N.W.2d 318, 323, *appeal dismissed*, 414 U.S. 803, 94 S.Ct. 130, 38 L.Ed.2d 39 (1973), we find the statute in this case to be no less defective than the 3.2 beer provision of the Civil Damages Act that we invalidated in *Wegan*. Accordingly, we hold that the survival statute fails the rational basis test and therefore violates the equal protection provision of the Minnesota Constitution.[10]

---

9. With respect to proof problems, Harper and James comment that:

> [T]he mere difficulty of proving something is no valid reason for forbidding all attempts to prove it. The rules of evidence and the requirements as to sufficiency of evidence (both of which are administered by the *court*) are generally thought sufficient safeguards against the danger that juries will find facts without legally adequate proof. A categorical prohibition of attempts at proof must here be justified upon an assumption that false but legally sufficient evidence will be not only offered but also accepted by the tribunal * * * more often than true evidence will be. Such an assumption not only shows a cynical lack of faith in the ability of our courts and juries to sift the true from the false, but it is a highly questionable one in fact. Small wonder then that a growing number of courts feel it is an inadequate basis for denying all remedy in cases where there is a serious and genuine injury.

> 2 F. Harper & F. James, *The Law of Torts* § 18.3, at 1029 (1956) (emphasis in original) (footnotes omitted).

10. Because we hold that Minn.Stat. § 573.01 (1980) violates the Minnesota Constitution, we need not decide whether it also violates the United States Constitution. However, since we regard the rational basis test as the same under both, we believe that the statute also could be found defective under the federal constitution. According to the United States Supreme Court's recent holding in *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981), the rational basis test is met if the legislature could have rationally decided that certain facts supported the classifi-

The survival statute is phrased in the negative; we cannot add language to it in order to render it constitutionally permissible. However, we can strike the middle sentence of section 573.01 and leave intact the first and third sentences. The statute will then read:

A cause of action arising out of an injury to the person dies with the person of the party in whose favor it exists, except as provided in section 573.02. * * All other causes of action by one against another, whether arising on contract or not, survive to the personal representatives of the former and against those of the latter.

The effect of the deletion of the second sentence is that all causes of action will survive the death of either party, except those arising out of the death of an injured plaintiff.[11] For this exception, the wrongful death statute, Minn.Stat. § 573.02 (1980), continues to govern.

We recognize that the effect of this decision is the abrogation of a common-law rule of long standing and ancient origin that our legislature adopted by statute in the 19th century. We also recognize that established rules of law are not to be overturned lightly. Nevertheless, when an old rule is found no longer to serve the needs of society, it should be set aside and replaced with one that reflects the interests and the will of the people and the demands of justice. *See Silesky v. Kelman*, 281 Minn. 431, 434, 161 N.W.2d 631, 633 (1968). "The common law is not a brooding omnipresence in the sky, but the articulate voice of some sovereign or quasi-sovereign that can be identified * * *." *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 222, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting). Because tort damages are now recognized as primarily compensatory rather than punitive, we see no reason why the fortuitous death of a tortfeasor should deprive any injured victim, regardless of the cause of his injuries, of an opportunity to obtain compensation.[12] This rule is to be applied to the instant case and to cases reaching final adjudication after the date of this decision.[13]

cation; whether the legislature's assessment of the facts actually was correct is irrelevant. *See id.* 449 U.S. at 464, 101 S.Ct. at 724. Courts may not "substitute their evaluation of legislative facts for that of the legislature." *Id.* 449 U.S. at 470, 101 S.Ct. at 727. In this case, were we to evaluate the federal constitutional claim, we would not need to determine whether the legislature actually was correct in deciding, if that is what it did, that the elements of intentional torts are more difficult to prove if the defendant is dead. Even if the legislature were correct in this regard, its failure to place intentional torts on an equal footing with other causes of action for which proof is no less difficult was unreasonable. Our problem is not with the legislature's factual determinations but with its classifications.

11. This solution is in accordance with the rule of statutory interpretation as set forth in Minn. Stat. § 645.20 (1980) which provides:

Unless there is a provision in the law that the provisions shall not be severable, the provisions of all laws shall be severable. If any provision of a law is found to be unconstitutional and void, the remaining provisions of the law shall remain valid, unless the court finds the valid provisions of the law are so essentially and inseparably connected with, and so dependent upon, the void provisions that the court cannot presume the legislature would have enacted the remaining valid provisions without the void one; or unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

The first and second sentences are not "so essentially and inseparably connected with" the middle sentence so that the entire statute must fall. Indeed, we can "presume the legislature would have enacted the remaining valid provisions without the void one."

12. In *Bigelow v. Halloran*, 313 N.W.2d 10 (Minn.1981), we applied the Iowa survival statute, Iowa Code § 611.20 (1980), which provides for the survival of all causes of action, noting that it was the better rule of law because it acknowledged the "essentially compensatory" nature of tort causes of action. *Id.* at 12.

13. Although we generally have applied decisions that abolish a tort immunity prospectively, *see, e.g., Nieting v. Blondell*, 306 Minn. 122, 132, 235 N.W.2d 597, 603 (1975); *Beaudette v. Frana*, 285 Minn. 366, 373, 173 N.W.2d 416, 420 (1969); *Silesky v. Kelman*, 281 Minn. 431, 443, 161 N.W.2d 631, 638 (1968), we believe that in this case the most equitable result will be achieved by applying the new rule retroactively. Immunity rules are usually overruled pro-

2. Thompson argues that if she is allowed to recover from Petroff's estate, she is also entitled to punitive damages. Although the punitive damages statute, Minn.Stat. § 549.20 (1980), does not expressly prohibit assessing punitive damages against the estate of a deceased defendant, we conclude that such damages are not recoverable. The purpose of punitive damages is to punish the tortfeasor where the act is malicious or wilful, and to deter him from repeating the wrongful act. *See, e.g., Wilson v. City of Eagan*, 297 N.W.2d 146, 151 (Minn.1980); *Gryc v. Dayton-Hudson Corp.*, 297 N.W.2d 727, 741 (Minn.1980); C. McCormick, *Handbook of the Law of Damages* § 77 (1935); W. Prosser, *supra*, § 2 at 9. Obviously, if the tortfeasor is dead, no need exists for either punishment or deterrence. Thompson contends that a potential tortfeasor will be deterred from committing an intentional tort by the fear that if he dies after committing the tort, his heirs will be deprived of part of his estate as a result of the estate's liability for punitive damages. This argument is not persuasive.

We acknowledge that the decedent's act in this case was particularly brutal; nevertheless, we cannot permit punitive damages to be assessed against his estate merely because Thompson very probably could have recovered them were Petroff still alive. Petroff is dead; to punish his estate instead would be to ignore the entire purpose of punitive damages.

Reversed and remanded.

---

spectively because to do so allows parties who may have relied upon the immunity rule the opportunity to obtain liability insurance. *See* Note, *The Retroactivity of Minnesota Supreme Court Personal Injury Decisions*, 6 Wm. Mitchell L.Rev. 179, 187 (1980). Although we are retroactively applying a rule that permits intentional tort causes of action to be brought against deceased tortfeasors' estates, we foresee no prejudice resulting to potential defendants in this situation, since insurance coverage for intentional torts normally is not available.