**Jean E. SCOTT, Respondent,**

v.

**MINNEAPOLIS POLICE RELIEF ASSOCIATION, INC., petitioner, Appellant.**

No. C7–99–1191.

Supreme Court of Minnesota.

Aug. 3, 2000.

Rischmiller, Knippel & Aronson, C.J. Knippel, Minneapolis, for appellant.

Michael C. Black Law Office Ltd., Michael C. Black, St. Paul, for respondent.

## OPINION

STRINGER, Justice.

Respondent Jean E. Scott and her husband Paul W. Scott, a Minneapolis police officer, were married in 1947. In 1979, the Scotts sold their house and separated. Both of the Scotts moved in with other people after separating, however they never divorced and continued to file joint tax returns until Paul Scott's death in August of 1995. After his death Jean Scott applied for pension benefits from the appellant, the Minneapolis Police Relief Association (MPRA), as a surviving spouse. The MPRA denied her request, claiming that Minn.Stat. § 423B.10, subd. 1(a) (1998), which provides that a surviving spouse must be "residing with" an MPRA member to receive benefits, requires the surviving spouse to reside with the member at the time of the member's death. The district court agreed and ruled that since Jean Scott did not reside with Paul Scott at the time of his death she was ineligible for pension benefits. The court of appeals reversed, holding that Jean Scott was entitled to surviving spouse benefits because she had resided with Paul Scott for many years and met the other requirements of the statute. *See Scott v. Minneapolis Police Relief Ass'n, Inc.,* No. C7–99–1191, 1999 WL 1216301, at *2 (Minn.App. Dec. 21, 1999). We reverse.

A year after Paul and Jean Scott were married Paul joined the Minneapolis police force where he was employed until he retired on April 14, 1983. Jean Scott worked as a seasonal employee at Brown & Bigelow in the shipping department from approximately 1950 to 1956 and full time from 1956 until she retired in January, 1993.[1]

---

1. Jean Scott did not work at Brown & Bigelow from 1979 to 1984, when she lived in Florida.

The Scotts raised three children together but their marriage was volatile, according to Jean Scott, with many instances of abuse. She claimed that she was frequently physically abused by Paul Scott but never sought medical care as a result of these confrontations nor did she report the abuse to the police because she was afraid her husband would lose his job. She testified that in 1978 Paul Scott told her that he wanted a divorce because he was in love with another woman. Around this time Jean also began a relationship with another man.

Jean Scott testified that in 1978 she and Paul prepared divorce papers but Paul changed his mind about the divorce, saying "[if] * * * I divorce you, then you don't get my police pension and you deserve my pension." She also testified that he promised her that he would make sure she was taken care of. Lance Scott, the Scotts' son, testified that his father did not want a divorce because he realized that Jean would not receive his pension benefits.

In 1979 the Scotts sold their house and Paul moved into the house of another woman. Although Paul periodically traveled to California and Wisconsin, he lived in the house until he died and never indicated that he planned to resume living with Jean.

Randy Scott, another Scott child, testified that when the house sold Jean received $40,000, approximately 60% of the profits from the sale. Jean then moved to Florida, where she lived until she returned to Minnesota some time between 1983 and 1984. Upon returning to Minnesota she moved into the house of her friend where she was living when Paul died. Her friend testified that he intended to live with Jean until one of them died. Jean used part of the proceeds from the sale of the Scott house to build a garage at her friend's house and to decorate the house, and she resumed employment at Brown & Bigelow where she worked full-time until 1993 when she retired. Jean had no ownership interest in the house, garage, or the property where she lived and her friend provided her no financial support.

Although the Scotts separated they continued to file joint tax returns. On various special occasions between the time Jean retired in 1993 and August of 1995 Paul gave her money which Jean estimated to total approximately $1,500. The only other money Jean received from Paul after 1979 was $1,000 he gave to Jean to create an IRA in her name which designated him as the beneficiary.[2] Jean also testified that since their separation in 1979 Paul mentioned living together once in 1985 but never brought it up again. The two saw each other only on special family occasions.

After Paul's death Jean applied for surviving spouse benefits under Paul's pension with the MPRA. She received a letter mailed on December 2, 1996 from the MPRA denying her benefits stating:

> [The MPRA] declines to pay any surviving spouse benefits to Jean E. Scott, surviving spouse of Paul W. Scott. The reason for the denial is the acknowledgment by the surviving spouse that she was not 'residing with' Paul W. Scott on the date of his death. Statute requires that she be 'residing with' the police officer on the date of his death, otherwise she is not entitled to pension benefits.

The executive director of the MPRA stated in an affidavit that Paul knew Jean could receive benefits only if she was residing with him when he died because police officers periodically receive a booklet summarizing retirement benefits and requirements for surviving spouses. Lance Scott, as the executor of his father's estate, also testified that when he was going through his father's personal belongings he ran

---

2. Jean Scott's annual wages from Brown and Bigelow totaled $20,363. From about 1990 to 1993 Jean estimated that she netted about $200 a week from her job. Since her retirement Jean receives social security and two small pensions from Brown & Bigelow totaling almost a thousand dollars a month.

across a 1991 issue of a magazine published for the Minnesota Police Pension Counsel containing a highlighted article entitled "Minneapolis Police Relief Association, surviving spouse defined." The article explained that a "surviving spouse" under the statute was a person legally married to and residing with a member and excluded a spouse who deserts a member or who is not dependent upon a member for support.

The executive director was aware of only three other cases where benefits were denied to a surviving spouse, all on the basis that the wife was not residing with her husband at the time of his death.[3] He further testified that there were three bases for denial of benefits to Jean: she was not living with Paul at the time of his death; she deserted him because they were living in separate residences and she had lived in Florida after their separation; and she was not dependent on him for support at the time of his death.

In April, 1997, Jean filed suit alleging that as a "surviving spouse" as defined in Minn.Stat. § 423B.01, subd. 12 (1998), she is entitled to benefits under Minn.Stat. § 423B.10, subd. 1(a), and if she is not entitled to benefits, then the statutes violate the Equal Protection Clauses of the United States and Minnesota Constitutions.[4] The district court granted MPRA's motion for summary judgment in May of 1998 ruling that the plain meaning of Minn.Stat. § 423B.10, subd. 1(a), clearly defines a "surviving spouse" as a spouse who was residing with the deceased member, and because the legislature used the present tense of "reside," it meant residing

at the time of the member's death. Therefore the court held that Jean did not qualify as a surviving spouse for pension benefit purposes. The court observed that if the legislature had intended otherwise it would have used "resided," and that the denial of benefits was fair and just because although the Scott marriage was not a sham, the parties separated and had no intent to resume living together. The court also found that Jean was not dependent upon Paul when he died but declined to rule on this basis under section 423B.01, subdivision 12, because Jean was already precluded from receiving benefits under the "residing with" language in section 423B.10, subdivision 1(a).

In December 1998 the district court issued an additional ruling denying Jean Scott's motion for summary judgment based upon her claim that the statute violated her right to equal protection under the Minnesota and United States constitutions.[5] The court concluded that under Minnesota's rational basis test, the purposes of the statute to support marriage, prevent sham marriages and reward spouses who remain in cohabitation were legitimate. The court further concluded that it was reasonable for legislators to believe that imposing a requirement of "residing with" the member at the time of the member's death reasonably promotes these purposes and that it was permissible for the legislature to limit those who qualify for pension benefits as a surviving spouse by distinguishing between spouses residing with a member and those residing

---

3. There are currently 12 female members of the MPRA. Eleven of the 12 are retired and receive a monthly service pension and if the married officers die before their spouses their husbands will receive the surviving spouse pension assuming all statutory requirements are satisfied. The executive director of the MPRA also stated in an affidavit that there are 249 female surviving spouses receiving spouse pensions of approximately $17,000 per year and the MPRA currently pays annual surviving spouse benefits of approximately $4.23 million.

4. Jean Scott also alleged that the denial of benefits unjustly enriched defendant. The district court did not address this claim.

5. The court noted that Minnesota does not have an equal protection clause per se but referred to Minn. Const. art. I, § 2, providing equivalent rights: "[n]o member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." Minn. Const. art I, § 2.

elsewhere. To Jean's argument that the Public Employees Retirement Association (PERA)[6] does not require cohabitation at the time of the member's death, the court noted that PERA is a different pension plan and therefore its terms are irrelevant.

The court of appeals reversed the district court.[7] *See Scott*, 1999 WL 1216301, at *2. The court held that the "residing with the decedent" language in Minn.Stat. § 423B.10, subd. 1(a), modifies the preceding phrase "*was* the legally married spouse of the decedent" and since Jean was married to Paul for 31 years, they had raised three children before separating and had filed joint tax returns until Paul's death, their marriage was not a sham and Jean did reside with Paul. *See Scott*, 1999 WL 1216301, at *1. The court also cited other pension statutes explicitly providing that residency at death is required,[8] and observed that chapter 423B has been revised three times since its adoption in 1992 with no change to the definition of surviving spouse except for a 1997 amendment extending benefits to surviving spouses who were married after retirement from active service. *See Scott*, 1999 WL 1216301, at *2. The court noted that Minn.Stat. § 423B.10, subd. 1(d) (1998), which requires that the surviving spouse be "residing with the decedent at the time of death," indicates a legislative intent to expand rather than limit pension benefits because it provides benefits to surviving spouses not otherwise qualified under the statute. *See Scott*, 1999 WL 1216301, at *2.

The court held that because section 423B.01, subdivision 12, provides that a "surviving spouse member" does not include a person who has deserted or who is not dependent upon the member for support, it imposes on section 423B.10, subdivision 1(a), an unreasonable requirement the legislature presumably did not intend, since many families today rely on two working spouses. *See Scott*, 1999 WL 1216301, at *2. The court further noted that there is no reference to either desertion or dependency in section 423B.10, subdivision 1(a), and suggested that when a definitional section intended to clarify a statutory provision actually blurs an otherwise bright line standard, severance is an appropriate remedy. *See Scott*, 1999 WL 1216301, at *2.

The MPRA now challenges the court of appeals ruling arguing that the "residing with" language in section 423B.10, subdivision 1(a), requires that the surviving spouse be residing with the member at the time of the member's death. Jean Scott does not dispute that she and Paul were not residing together when he died but maintains that the statutory language expresses no such requirement.

Summary judgment is appropriate where there are no genuine issues of material fact and our review is limited to determining whether the lower court erred in its application of the law. *See Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979). We apply a de novo standard of review to questions of statutory interpretation. *See State by Beaulieu v. RSJ, Inc.*, 552 N.W.2d 695, 701 (Minn.

---

**6.** The Public Employees Retirement Association (PERA) chapter does not contain a "residing with" requirement in its definition of "surviving spouse." *See* Minn.Stat. § 353.01, subd. 20 (1998).

**7.** Jean Scott filed an appeal from the district court's order for judgment on January 6, 1999, but the appeal was dismissed by the court of appeals on April 13, 1999, because the district court's order for judgment did not adequately resolve all issues before the district court. The district court entered a revised order for judgment on May 5, 1999, and

judgment was entered on that order on May 24, 1999. A second appeal was taken from that judgment on July 12, 1999.

**8.** *See* Minn.Stat. § 423.58, subd. 2 (1998) (statute in Police Pensions chapter defining surviving spouse as "residing with the member at the time of the member's death"); Minn.Stat. § 424.24, subd. 2(a) (1998) (statute in Firefighters' Relief and Retirement chapter defining surviving spouse as "residing with the member at the time of the member's death").

1996). The primary objective of statutory interpretation is to ascertain and effectuate the legislature's intent, *see Boutin v. LaFleur*, 591 N.W.2d 711, 715 (Minn.1999), and we liberally construe and apply pension statutes to carry out their purpose, *see Donaldson v. Mankato Policemen's Benefit Ass'n*, 278 N.W.2d 533, 537 (Minn. 1979).

Minnesota Statutes § 423B.10, subd. 1(a), was enacted in 1992[9] and provides:

> The surviving spouse of a deceased service pensioner * * * who was the legally married spouse of the decedent, residing with the decedent, and who was married while or before the time the decedent was on the payroll of the police department * * * is entitled to a surviving spouse benefit.

Minn.Stat. § 423B.10, subd. 1(a).[10]

We have interpreted similar clauses in pension statutes with some frequency over the years. In *State ex rel. Livingston v. Minneapolis Fire Department Relief Association*, appellant and her husband, a firefighter, lived together until a few months after his retirement in 1913. 205 Minn. 204, 204, 285 N.W. 479, 479 (1939). Mr. Livingston died in 1936 after being separated from his wife for 23 years, almost the same length of time they lived together. *See id.* at 205, 285 N.W. at 479. We denied the award of pension benefits because the Livingstons were not residing together at the time of Mr. Livingston's death on the basis of a statute providing that a widow was entitled to benefits "when a service pensioner * * * dies, leaving * * * [a] widow who was his legally married wife, residing with him * * *." *Id.* at 206–07, 285 N.W. at 480. We observed that the qualification for entitlement, adopted by the legislature in 1933, was a matter of legislative policy and held: "[t]he statute should be construed as it reads, and effect given to the clear meaning of its language. It is clear that relator cannot qualify as a wife who resided with the pensioner at the time of his death." *Id.* at 206–207, 285 N.W. at 480.

Similarly, in *Butler v. Minneapolis Police Relief Association*, the Butlers were married in 1928 and lived together intermittently until 1949 when Mr. Butler, a police officer, permanently left their home to live with his mother until his death in 1957. 283 Minn. 70, 72–73, 166 N.W.2d 705, 707 (1969). The relevant statute[11] provided that pension benefits were payable to widows, defined as "[the officer's] legally married wife, residing with him * * *" but the MPRA's bylaws excluded a "surviving wife who has deserted a police officer or pensioner, or who has not been dependent upon him for support." *Id.* at 71–72, 166 N.W.2d at 706. Mrs. Butler contended that the language excluding a wife who deserted or was not dependent on her husband implied that those wives who did not desert and were dependent should receive a pension. We rejected her argument, concluding she was entitled to benefits only if she did not desert her husband, was dependent on him and resid-

---

9. *See* Act of April 15, 1992, ch. 471, art. 1, § 9, 1992 Minn. Laws 313, 322.

10. In 1997 the statute was amended to include a provision that a surviving spouse not otherwise qualifying may receive a benefit if the spouse was married to the decedent for five years and was residing with the decedent at the time of death. *See* Act of June 2, 1997, ch. 233, art. 4, § 7, subd. 1, (d), 1997 Minn. Laws 2643, 2709. Minnesota Statutes § 423B.01, subd. 12, also enacted in 1992, defines "surviving spouse member" as:

> the person who was the legally married spouse of the member, who was residing with the decedent, * * * and who, in case the deceased member was a pensioner or deferred pensioner, was legally married to the member at least one year before the decedent's termination of active service with the police department. The term does not include the surviving spouse who has deserted a member or who has not been dependent upon the member for support * * *.

Minn.Stat. § 423B.01, subd. 12.

11. The statute was L.1953, c. 126, § 6, a prior version of the MPRA statute.

ed with him at the time of his death. *See id.* at 73–74, 166 N.W.2d at 707.

In *Donaldson* the parties were married from 1932 until Mr. Donaldson, a Mankato police officer, died in 1967, but they permanently separated three years before his death when Mrs. Donaldson initiated a divorce action. 278 N.W.2d at 535. The Mankato Policemen's Benefit Association denied Mrs. Donaldson's application for pension benefits under a statute providing that pension benefits were limited to "a widow * * * [who never] applied for any divorce or legal separation, and who * * * in any case, was residing with [the pensioner] at the time of his death. No temporary absence for purposes of business, health, or pleasure shall constitute a change of residence * * *." *Id.* (citation omitted). We held that although the Donaldsons were separated at the time his death, it was "a temporary absence * * * precipitated by reasons of the respective health conditions of the parties and by circumstances neither had the ability to cope with or control," thus under the statute Mrs. Donaldson was eligible for the pension benefits.[12] *Id.* at 537.

■ The MPRA argues that Jean Scott is not entitled to pension benefits because we held in *Butler* that an earlier version of the MPRA required a surviving spouse to reside with an MPRA member at the time of death.[13] The MPRA also argues the present tense use of "reside" indicates that the legislature intended the surviving spouse to reside with the member at the time of death. The MPRA distinguishes *Donaldson* on the ground that the statute there specifically stated that a spouse

would not be precluded from receiving pension benefits where the separation was temporary and for health reasons. Here, the MPRA argues, there is no such statutory provision, the Scotts were not separated temporarily and were not separated because of health. Finally, the MPRA argues that section 423B.01, subd. 12, disqualifies spouses where they desert or are not dependent on a MPRA member indicating a legislative intent to reward spouses who reside together until the member's death.

Jean Scott argues that she should receive pension benefits because she meets the criteria of section 423B.10, subdivision 1(a): she was the legally married spouse of Paul, she resided with him and she was legally married to him up to the time of his death. She further asserts that the MPRA's construction of the statute is absurd because it would deny a surviving spouse pension benefits if the spouse were hospitalized or on an extended vacation at the time of the member's death, and that in its 110 year history the statute has never required that a surviving spouse reside with the MPRA member at the time of death. She also contends that PERA, which covers Minneapolis police officers enrolled after 1980, includes no such limitation and that since the surviving spouse of a PERA member would not be denied surviving spouse benefits under the same circumstances it would be unfair and inconsistent to deny her pension benefits. *See* Minn.Stat. § 353.01, subd. 20 (1998) (surviving spouse must be "legally married to the member at the time of death"). She distinguishes *Butler* and *Livingston* on the

---

12. We also held that Mrs. Donaldson had not "applied for a divorce" under the statute because she abandoned the action soon after a court required Mr. Donaldson to pay an amount in alimony every month. *Donaldson,* 278 N.W.2d. at 536.

13. Appellants base this argument on *Wynkoop v. Carpenter,* where we stated:

Once this court has construed a statute, that interpretation is as much a part of the

statutory text as if it had been written into the statute originally.
* * * *
* * * When a judicial interpretation of a statute has remained undisturbed, it becomes part of the terms of the statute itself. 574 N.W.2d 422, 425–26 (Minn.1998) (citations omitted). Appellants claim that under *Wynkoop,* the *Butler* holding is "as much a part of the statutory text as if it had been written into the statute originally." *Wynkoop,* 574 N.W.2d at 425.

ground that *Butler* addressed the 1953 version of the MPRA statute which was amended in 1992, and *Livingston* involved a fire department relief statute.[14]

Jean Scott finally argues that the language in section 423B.01, subdivision 12, excluding spouses who desert or are not dependent on their spouse does not exclude her because the trial court did not address whether she deserted or was dependent upon Paul for support at the time of his death. Even if it had, she contends, section 423B.10, subdivision 1(a), does not refer to section 423B.01, subdivision 12, or to its dependency and desertion requirements, thus the legislature did not intend the "surviving spouse member" definition to control the surviving spouse eligibility determination under section 423B.10, subdivision 1(a).

■ We disagree with Jean Scott's understanding of the statutes and hold that the language in section 423B.01, subdivision 1(a), that the surviving spouse is the person "who was the legally married spouse of the decedent, residing with the decedent," means residing with the member at the time of the member's death. The court of appeals reversed reasoning that the use of "was" in "who *was* the legally married spouse of the decedent" indicates that "residing with" should be read in the past tense–that is, that the surviving spouse lived with the deceased member *at some time* during their marriage. *Scott*, 1999 WL 1216301, at *2. But this proves too much, because "was" also precedes "married to the spouse," and parallel reasoning would lead to the conclusion that a surviving spouse who was married to the member at any time, but not necessarily at the time of death, would qualify for surviving spouse benefits–clearly not the legislature's intent. That the surviving spouse must have resided with the deceased member at the time of death is

further supported by section 423B.01, subdivision 12, because it specifically excludes spouses who are not dependent on or who have deserted the member and the trial court found that Jean Scott was not dependent on Paul at the time of his death.

Our previous rulings support this conclusion. *Butler,* where we reviewed an older version of the MPRA statute with facts virtually identical to those here, is key to our analysis. In *Butler* we concluded that because the Butlers had not lived together in nearly eight years, "it is clear that plaintiff cannot qualify under any meaning of the statute requiring her to be 'residing with' Mr. Butler at the time of his death." 283 Minn. at 73, 166 N.W.2d at 707. We find it equally clear that under an updated version of the MPRA statute, Jean Scott, who had not resided with Paul for fifteen years, is similarly precluded from receiving surviving spouse benefits.

While there is some evidence that Jean Scott was abused by Paul, *Donaldson* does not influence our decision because the separation here was permanent. We conclude that section 423B.10, subdivision 1(a), precludes Jean Scott from receiving surviving spouse benefits because she was not residing with Paul at the time of his death.

■ We now turn to whether section 423B.10, subdivision 1(a), violates the Equal Protection Clauses of the United States and Minnesota Constitutions given our conclusion that it requires a surviving spouse to be residing with a pensioner at the time of death. Minnesota law is clear that Minn.Stat. § 423B.01, subd. 1(a), like all statutes, is presumed constitutional and should be declared unconstitutional only if beyond a reasonable doubt it violates a constitutional provision. *See Miller Brewing Co. v. State,* 284 N.W.2d 353, 356 (Minn.1979).

---

**14.** Jean Scott also questions the relevance of *Wynkoop* on the ground that in *Wynkoop* we observed that once a statute has been amended previous judicial interpretations are no

longer controlling, *see Wynkoop,* 574 N.W.2d at 427, and that this statute was extensively amended in 1992 and subsequently.

■ The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution provides in relevant part "[no state shall] deny to any person within its jurisdiction the equal protection of laws." U.S. Const. amend. XIV, § 1. Article I, section 2 of the Minnesota Constitution provides "[n]o member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." Minn. Const. art. I, § 2. Both clauses have been analyzed under the same principles and begin with the mandate that all similarly situated individuals shall be treated alike, but only "invidious discrimination" is deemed constitutionally offensive. *In re Estate of Turner*, 391 N.W.2d 767, 769 (Minn.1986) (quoting *Ferguson v. Skrupa*, 372 U.S. 726, 732, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963)) (reviewing statute under both state and federal constitutions). Additionally, unless a constitutional challenge to the statute involves a suspect classification or a fundamental right, we review the challenge under a rational basis standard under both the state and federal constitutions. *See id.* Minnesota Statutes § 423B.10, subd. 1(a), is thus "presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* (quoting *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)).

■ In our determination whether a challenged classification is rationally related to a legitimate governmental purpose, we have over the years developed two formulations. One formulation is the standard articulated by federal courts for the Equal Protection Clause of the United States Constitution, where it first must be determined whether the challenged legislation has a legitimate purpose, and second, whether it was reasonable for legislators to believe that the use of the challenged classification would promote that purpose. *See, e.g., id.* at 769–770; *see also Western & S. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 668, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981). The second formulation of the test, often characterized as the Minnesota rational basis test, requires that:

(1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs;

(2) the classification must be genuine or relevant to the purpose of the law; that is there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; and

(3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*State v. Russell*, 477 N.W.2d 886, 888 (Minn.1991).[15]

**15.** These formulations have raised questions concerning their applicability in different contexts, *see, e.g.,* Ann L. Iijima, *Minnesota Equal Protection in the Third Millennium: "Old Formulations" or "New Articulations"?,* 20 Wm. Mitchell L.Rev. 337, 359 (1994), and have been the topic of some discussion by the court, *see, e.g., Turner,* 391 N.W.2d at 770 n. 2, 771–72 (Wahl, J., concurring specially) (majority stating that the two formulations "merely represent different ways of stating the same analysis" but concurring opinion by Justice Wahl concluding that the difference between the federal and Minnesota rational basis test is that Minnesota's test requires "a reasonable connection [to] be shown between the actual, and not just theoretical, affect of the challenged classification and the statutory goals"); *Russell,* 477 N.W.2d at 889 (stating that the three-prong Minnesota rational basis test is "our stricter standard of rational basis of review" and holding that the stricter version is "particularly appropriate" where there is a disproportionate burden "on the very class of persons whose history inspired the principles of equal protection"); *Mitchell v. Steffen,* 504 N.W.2d 198, 210 (Minn.1993) (Tomljanovich, J., dissenting) (dissent characterizing the *Russell* three-part test as a mid-

Against this backdrop we assess the parties' arguments. Jean Scott contends that section 423B.01, subdivision 1(a), violates her right to equal protection under both the Minnesota and United States Constitutions because the statute does not have a legitimate purpose if it is intended to ensure that MPRA members live in a traditional family setting, as it would intrude on the "private realm of family life which the state cannot enter." *Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (quotation omitted).[16] She additionally argues that even if the statutory goal is to create an incentive for spouses to remain married to and to care for members, the denial of benefits is not relevant or genuine to this purpose because the statute has the opposite effect–the non-residing spouse is encouraged to divorce the member because divorce provides her an equitable share of the accrued benefit the challenged statute would otherwise prevent. Further, Jean Scott points out that if Paul joined the police department after 1980, she would be covered under the PERA and there is no rational basis for treating her differently than the spouse of a member joining after an arbitrary date. Finally, she notes that the statute has denied benefits to women only and thus raises equal protection concerns on this basis as well.

The MPRA argues that the statutory classification is genuine and relevant to the purpose of the pension statute because the benefits are intended for those surviving spouses contributing to the welfare of the member, and the statute creates a financial incentive for a spouse to provide society and companionship to a member. It also argues that since the state and city contribute to police pensions it is rational and not arbitrary for the legislature to limit the benefits it confers to secondary beneficiaries providing care and comfort to primary beneficiaries. The MPRA points out that the excluded spouses are not similarly situated to those spouses receiving pensions because they do not reside with pensioners, are not dependent on them and have abandoned them. It finally asserts that the pension statute does not discriminate on the basis of gender, noting that Jean Scott concedes it is neutral on its face, and as applied, the MPRA pays several million dollars per year in surviving spouse benefits to 249 women.

We agree with the MPRA and hold that Minn.Stat. § 423B.01, subdivision 1(a), does not violate the Equal Protection Clause of the United States Constitution or the Minnesota Constitution under either formulation of the rational basis test. We conclude that the purpose of section 423B.01, subdivision 1(a), to provide an incentive for spouses to stay with and care for the pensioner and to prevent sham marriages is legitimate. We similarly conclude that because of the physical, emotional and financial dependency that generally results from cohabitation, it is "natural and reasonable" for the legislature to distinguish between a spouse residing with a member at the time of the member's death and a spouse not so residing. Additionally, as we have previously held, the legislature has the authority to limit public bene-

level of scrutiny and proposing that this level should apply for "semi-suspect classes and for legislation which is neutral on its face but which has a disparate impact upon a suspect class" and that the minimal level of scrutiny articulated in the two-prong federal test should remain as the traditional rational basis analysis). We have also held that the justification for a valid classification does not depend on "ironclad uniformity," and the grounds for treating similarly situated people differently may be slight, provided the discrimination is supported by a reasonable distinction based on facts. *Fabio v. City of Saint*

*Paul,* 267 Minn. 273, 277, 126 N.W.2d 259, 262–63 (1964) (citation omitted).

16. The purposes of pension statutes are to "enable the employer to attract better employees, to reduce turnover, to facilitate orderly retirement of older employees, to retain valuable employees * * * and, most importantly from the employee viewpoint, to assure a measure of income upon retirement adequate to allow the annuitant to live in reasonable security." *Christensen v. Minneapolis Mun. Employees Retirement Bd.,* 331 N.W.2d 740, 747 (Minn.1983).

fits to secondary beneficiaries, to whom it will ultimately pay a sizable benefit, so long as the limitations are based on reasonable distinctions supported by facts. *See, e.g., Fabio,* 267 Minn. at 277, 126 N.W.2d at 262–63; *Gibbs v. Minneapolis Fire Dept. Relief Ass'n,* 125 Minn. 174, 177, 145 N.W. 1075, 1076 (1914) ("the government may withdraw the benefits conferred at any time it may deem advisable" (citation omitted)). We view this distinction as supported by facts insofar as the requirement that a couple reside together at the time of the member's death is relevant to the statutory purpose of encouraging secondary beneficiaries to provide care and companionship to primary beneficiaries. Minnesota Statutes § 423B.10, subd. 1(a), is thus rationally related to the legitimate governmental purposes of preventing sham marriages and encouraging secondary beneficiaries to care for MPRA members.

Jean Scott's contention that an arbitrary distinction is created when surviving spouses of members joining the police department after 1980 would receive benefits because PERA does not contain the "residing with" language is unpersuasive because PERA is a different pension plan with different provisions and members of PERA and of the MPRA cannot reasonably be viewed as similarly situated—thus equal protection concerns do not arise.

Finally, as to Jean Scott's contention that she was denied equal protection on the basis of sex because only wives have been denied benefits by reason of not residing with the member at the time of the member's death, we point out that the MPRA pays millions of dollars per year to wives and will pay benefits to husbands who are surviving spouses so long as in both cases all statutory requirements are met. Therefore we conclude there was no equal protection violation.

Reversed.