STATE of Minnesota, Respondent,

v.

Diane Marie COX, Appellant.

No. A09–1958.

Supreme Court of Minnesota.

June 15, 2011.

Lori Swanson, Attorney General, St. Paul, MN; and Robin Finke, Swift County Attorney, Harry D. Hohman, Assistant County Attorney, Benson, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, St. Paul, MN; and Julia Dayton Klein, Lauren J. Galgano, Special Assistant State Public Defenders, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, for appellant.

## OPINION

GILDEA, Chief Justice.

This case involves a question certified to the court of appeals raising an equal-protection challenge to appellant's prosecution under the dishonored-check statute, Minn. Stat. § 609.535 (2010). The dishonored-check statute provides in some circumstances for harsher penalties than the theft-by-check statute, Minn. Stat § 609.52, subd. 2(3)(i) (2010), and appellant relies on this disparity to support her equal-protection challenge. The court of appeals concluded that appellant had not established an equal-protection violation and answered the certified question in the negative. Because we conclude appellant, who has been charged with writing a dishonored check, is not similarly situated for equal-protection purposes to a person who commits theft by check, we affirm.

Respondent State of Minnesota charged appellant Diane Cox with issuing dishonored checks with a value of more than $500, in violation of Minn.Stat. § 609.535, subd. 2a(a)(1), which is a felony. The complaint alleged that in December 2008, Cox issued five checks totaling $515.83 to businesses in Benson, Minnesota. The bank

returned the checks to the businesses marked as funds not available. Each business sent, via certified mail, a notice and demand for payment of dishonored check to the address listed for Cox on the check, but Cox did not pay the dishonored checks.

Cox filed a motion to dismiss, arguing that the sentencing disparity between the dishonored-check statute, Minn.Stat. § 609.535, and the theft-by-check statute, Minn.Stat. § 609.52, subd. 2(3)(i), violated her constitutional right to equal protection of the law because issuing a dishonored check is a lesser-included offense of theft-by-check, yet it is punished more harshly than the greater offense. The district court denied Cox's equal-protection challenge but also found the issue presented was "so important or doubtful as to require a decision of the Court of Appeals" and certified a question for appellate review.

The question certified to the court of appeals by the district court was:

> Does the disparity in the severity of punishment between Minn.Stat. § 609.535, subd. 2a(a)(1) and Minn.Stat. § 609.52, subd. 3(4), which arguably contemplate the same acts committed under the same circumstances by persons in like situations (writing worthless checks with an aggregate value over $500), constitute an Equal–Protection Violation as applied to Defendant and those similarly charged statewide?

The court of appeals answered the certified question in the negative. *State v. Cox*, No. A09–1958, 2010 WL 2572562, at *5 (Minn.App. June 29, 2010). We granted Cox's petition for review.

### I.

A certified question is a question of law that we review de novo. *Cargill, Inc. v. Ace Am. Ins. Co.*, 784 N.W.2d 341, 347 (Minn.2010). The constitutionality of a statute also presents a question of law, subject to de novo review. *State v. Melde*, 725 N.W.2d 99, 102 (Minn.2006). We presume that Minnesota statutes are constitutional and will strike down a statute as unconstitutional only if absolutely necessary. *Id.* To prevail, a party challenging the constitutionality of a statute must demonstrate beyond a reasonable doubt that the statute violates a constitutional provision. *Miller Brewing Co. v. State*, 284 N.W.2d 353, 356 (Minn.1979).

### A.

The relevant statutes at issue in this case are the dishonored-check statute and the theft-by-check statute. Issuing a dishonored check is a lesser-included offense of theft by check. *State v. Roden*, 384 N.W.2d 456, 457 (Minn.1986) ("The greater offense of theft by check involves a defendant issuing a check knowing he is not entitled to do so (*i.e.*[,] knowingly issuing a bad check) as part of a scheme whereby he intentionally defrauds another person into transferring property to him.").

The dishonored-check statute prohibits a person from "issu[ing] a check which, at the time of issuance, the issuer intends shall not be paid." Minn.Stat. § 609.535, subd. 2. The statute further provides that intent may be shown by proof that: (1) at the time of issuance, the issuer did not have an account with the drawee; (2) at the time of issuance, the issuer had insufficient funds with the drawee and the issuer failed to pay the check within five business days after a notice of nonpayment was mailed; or (3) when presentment was made within a reasonable time, the issuer had insufficient funds and failed to pay the check within five business days after a notice of nonpayment was mailed. *Id.*, subd. 3.

The penalty for violating the dishonored-check statute varies, depending on the value of the checks at issue. A person convicted of issuing a dishonored check may be sentenced "to imprisonment for not more than five years or to payment of a fine of not more than $10,000, or both, if the value of the dishonored check, or checks aggregated . . . is more than $500." [1] Minn.Stat. § 609.535., subd. 2a(a)(1). The offense is a gross misdemeanor "if the value of the dishonored check, or checks aggregated . . . is more than $250 but not more than $500." *Id.*, subd. 2a(a)(2). The offense is a misdemeanor "if the value of the dishonored check, or checks aggregated . . . is not more than $250." *Id.*, subd. 2a(a)(3).

The theft-by-check statute prohibits a person from obtaining property or services of a third person by "intentionally deceiving the third person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made." Minn.Stat. § 609.52, subd. 2(3) (2010). A false representation includes "the issuance of a check, draft, or order for the payment of money, except a forged check as defined in section 609.631, or the delivery of property knowing that the actor is not entitled to draw upon the drawee therefor or to order the payment or delivery thereof." *Id.*, subd. 2(3)(i).

The penalty for theft by check also varies, depending on the value of the goods or services stolen. [2] Minn.Stat. § 609.52, subd. 3 (2010). The penalty for theft by check is "imprisonment for not more than five years" if "the value of the property or services stolen is more than $1,000 but not more than $5,000." [3] *Id.*, subd. 3(3)(a). The offense is a gross misdemeanor if "the value of the property or services stolen is more than $500 but not more than $1,000." *Id.*, subd. 3(4). The offense is a misdemeanor if "the value of the property or services stolen is $500 or less." *Id.*, subd. 3(5).

Thus, if a person is charged with theft by check and he or she stole goods or services worth the amount at issue in this case, $515.83, the offense is a gross misdemeanor. [4] But if a person is charged with issuing dishonored checks in this amount, the offense is a felony. This difference in offense level provides the basis for Cox's equal-protection challenge.

1. To determine the penalty, the dishonored-check statute provides that "the value of dishonored checks issued by the defendant in violation of this subdivision within any six-month period may be aggregated." Minn. Stat. § 609.535, subd. 2a(b).

2. Under the theft-by-check statute, the value of the goods or services stolen within a six-month period can be aggregated to determine under which penalty provision the defendant should be charged. Minn.Stat. § 609.52, subd. 3(5) (2010).

3. In some circumstances, theft by check is a felony if the value of the goods or services stolen is less than $1,000, such as when the item stolen is a car or consists of public funds, or when the defendant was convicted of certain offenses within the past 5 years. Minn.Stat. § 609.52, subds. 3(3)(c), 3(3)(d)(iv), and 3(3)(d)(v). None of these provisions are applicable in this case.

4. This disparity in sentencing between the theft-by-check statute and the dishonored-check statutes appears to be a recent phenomenon. Prior to 2007, the penalties for violating the two statutes essentially mirrored each other. *Compare* Minn.Stat. § 609.52, subds. 3(3)(a), 3(4), and 3(5) (2006), *with* Minn.Stat. § 609.535, subd. 2a(a) (2006). In 2007, however, the theft statute was amended so that the amount a person had to steal for the various penalty provisions increased. Act of May 7, 2007, ch. 54, art. 2, § 8, 2007 Minn. Laws 233, 240–41 (codified at Minn.Stat. § 609.52, subd. 3 (2010)). No similar change was made to the dishonored-check statute.

## B.

■ Cox brings her equal-protection challenge under Article I, Section 2, of the Minnesota Constitution. This section provides that, "No member of this state shall be disenfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." Minn. Const. art. I, § 2.

■ It is well settled that in order "[t]o establish that [s]he has been denied equal protection of the laws, [Cox] must show that similarly situated persons have been treated differently." *Paquin v. Mack,* 788 N.W.2d 899, 906 (Minn.2010); *see also State v. Frazier,* 649 N.W.2d 828, 837 (Minn.2002) ("The [E]qual [P]rotection [C]lause guarantees that similarly situated individuals receive equal treatment."); *State v. Mitchell,* 577 N.W.2d 481, 492 (Minn.1998) ("The Equal Protection Clause requires that the state treat all similarly situated persons alike."). We impose this threshold showing "because the guarantee of equal protection does not require that the State treat persons who are differently situated as though they were the same." *Paquin,* 788 N.W.2d at 906. And we have routinely rejected equal-protection claims when a party cannot establish that he or she is similarly situated to those whom they contend are being treated differently. *See, e.g., Frazier,* 649 N.W.2d at 839 (rejecting equal-protection challenge to different penalties for violation of RICO statute and the crime-committed-for-a-gang stat-

ute because people who violate each statute are not similarly situated); *Heidbreder v. Carton,* 645 N.W.2d 355, 376–77 (Minn. 2002) (rejecting equal-protection challenge to adoption statutes that treated birth mothers differently than putative fathers because putative father was not similarly situated to a birth mother with respect to their relationship with the child); *Mitchell,* 577 N.W.2d at 492–93 (rejecting equal-protection claim because 15–year–old defendant, who committed first-degree murder and was tried as an adult, was not similarly situated to 15–year–olds who commit first-degree murder but remain in the juvenile system).[5]

■ While we have not always followed federal law in interpreting our state Equal Protection Clause, *see State v. Russell,* 477 N.W.2d 886, 888 (Minn.1991), we have relied on federal law to determine if two groups are similarly situated, *see State v. Garcia,* 683 N.W.2d 294, 298 (Minn. 2004) (explaining that the Equal Protection Clauses of both the United States and Minnesota Constitutions "have been analyzed under the same principles and begin with the mandate that all similarly situated individuals shall be treated alike" (citation omitted) (internal quotation marks omitted)). We have embraced the rationale of the U.S. Supreme Court by explaining that the Equal Protection Clause "does not require the state to treat things that are different in fact or opinion as though they were the same in law." *State v. Behl,* 564 N.W.2d 560, 568 (Minn.1997); *see also Ri-*

5. The dissent agrees that in order to establish an equal-protection violation under the Minnesota Constitution, Cox must first make a threshold showing that she is similarly situated to the people she claims are being treated differently than herself. Because we conclude that Cox has not made this showing, it is not necessary to determine whether Cox has also established that the disparity in sentencing between the theft-by-check and dis-

honored-check statutes fails the rational basis test under the Minnesota Constitution. While the dissent attempts to reconcile our equal-protection case law with respect to the rational basis test under the Minnesota Constitution, that analysis is not necessary to our resolution of this case and we express no opinion on the validity of the dissent's attempt at reconciliation.

*naldi v. Yeager*, 384 U.S. 305, 309, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966) (stating that the Equal Protection Clause " 'does not require things which are different in fact ... to be treated in law as though there were the same.' " (alteration in original)) (quoting *Tigner v. State of Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 84 L.Ed. 1124 (1940)). In addition, "controlling law is clear that '[t]he Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.' " *Ruberto v. Cnty. of Washington*, 572 N.W.2d 293, 299 (Minn.1997) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)). The focus, then, in determining whether two groups are similarly situated is whether they are alike in all relevant respects.

■ Of particular relevance to that analysis in this case is our jurisprudence holding that when an equal-protection claim challenges the difference in sentences for different offenses, the critical factor is whether the two statutes prohibit the same conduct. In *State v. Dietz*, the defendants were charged with felony grand larceny for having stolen something with a value of less than $25 from an automobile at night. 264 Minn. 551, 551, 119 N.W.2d 833, 834 (1963). The defendants claimed that their right to equal protection was violated because other statutory provisions made stealing something with a value of more than $25 but less than $100 from an automobile at night petit larceny, which was a misdemeanor. *Id.* at 554, 119 N.W.2d at 835. We stated that "[e]qual protection of the laws is not denied by a statute prescribing the punishment to be inflicted on a person convicted of crime, unless it prescribes different punishments for the same acts committed under the same circumstances by persons in

like situation." *Id.* at 558, 119 N.W.2d at 837 (citation omitted) (internal quotation marks omitted). We concluded that there was no equal-protection violation because the statutes did not prohibit the same acts, and "[t]he mere fact that those who steal property of a greater value under like circumstances may be subject to a lesser penalty does not affect defendants." *Id.* at 558–59, 119 N.W.2d at 838.

More recently, we addressed the issue of whether the disparity in sentencing between two statutes violated equal protection in *Frazier*, which involved an as-applied constitutional challenge. 649 N.W.2d at 829. In *Frazier*, the defendant, who was convicted of having committed a controlled-substance crime for the benefit of a gang, in violation of Minn.Stat. § 609.229 (2000), argued that his right to equal protection was violated because Minnesota's RICO statute punished criminal conduct similar to that prohibited by the gang statute, but the gang statute imposed a longer sentence. 649 N.W.2d at 829, 837. We rejected his claim because we determined that Frazier was not similarly situated to someone who was convicted of violating the RICO statute. *Id.* at 839.

We held that "[a] statute violates the equal protection clause when it prescribes different punishments or different degrees of punishment for the same conduct committed under the same circumstances by persons similarly situated." *Id.* at 837. To answer this question, we explained that "the critical inquiry is whether the elements of section 609.229 and the RICO statute are the same or essentially similar." *Frazier*, 649 N.W.2d at 837. We denied Frazier's equal-protection claim after focusing on the conduct Frazier admitted to when he pleaded guilty to violating the gang statute and determining that this conduct was insufficient to support a conviction under RICO. *Id.* at 838–39. We

concluded that "Frazier, whose conviction under [the gang statute] was based on the commission of one criminal offense, is not similarly situated to an individual convicted under RICO, whose conviction must be based on his participation in at least three criminal acts." *Id.* at 839. Thus, we used the specific conduct of the defendant as a way of showing that the statutes did not prohibit the same conduct, resulting in Frazier not being similarly situated to someone who violated the RICO statute. *See id.; see also State v. Barnes,* 713 N.W.2d 325, 331–32 (Minn.2006) (rejecting equal-protection challenge to difference in punishment for first-degree domestic-abuse murder and third-degree depraved-mind murder because the two statutes "do not punish identical conduct" based on difference in elements of the offenses).

 Our decisions in *Dietz* and *Frazier* demonstrate that in order for a defendant to prevail on an equal-protection claim based on the disparity in sentencing for two different offenses, the defendant must first show that a person who is convicted of committing one offense is similarly situated to people who are convicted of committing the other offense.[6] In order to demonstrate this, a defendant must show that the two statutes prohibit the same conduct because the specific conduct of the defendant would support a conviction for either offense.[7] Cox's equal-protection claim fails under this analysis.

We begin this analysis by comparing the two statutes. Under both statutes, the State is required to prove the defendant issued a worthless check. *Compare* Minn. Stat. § 609.52, subd. 2(3)(i), *with* Minn. Stat. § 609.535, subd. 2. The statutes, however, have different mens reas. The dishonored-check statute requires the State to prove that when the check was issued, the defendant intended the check not be paid. Minn.Stat. § 609.535, subd. 2. The dishonored-check statute contains a permissible inference, under which the State may prove that a defendant issued a check with the intent that it not be paid by showing that the defendant did not have sufficient funds in her account to cover the check and that she did not pay the check within five business days of a notice of

6. We acknowledge that in some of our cases involving an equal-protection challenge to the difference in sentences for two offenses, we have not expressly concluded the defendant was similarly situated to a person who committed the other offense at issue before resolving the case by analyzing the difference in sentences under a rational-basis test. *See State v. Benniefield,* 678 N.W.2d 42, 46–48 (Minn.2004); *Russell,* 477 N.W.2d at 889–91. There is no language in these cases, however, suggesting that a defendant could establish an equal-protection violation if she was not similarly situated to people who commit a different offense and to whom she was comparing herself. *See Benniefield,* 678 N.W.2d at 46–48; *Russell,* 477 N.W.2d at 888–91.

7. The dissent contends that we are applying too stringent a standard by requiring Cox to prove her conduct would support a conviction for both issuing worthless checks and theft by check. Instead, the dissent contends, without

any legal support, that Cox "must show that there was probable cause to support a charge of either theft by check or issuing a dishonored check." The dissent's focus on whether there is probable cause to support a charge under either statute is erroneous. The disparity that is the basis for Cox's equal-protection challenge is a sentencing disparity. Because a sentence cannot be imposed unless a person is convicted of an offense, the appropriate test is whether Cox could be *convicted* of both statutes based on her specific conduct. Our precedent so holds. For example, in *Frazier* we specifically held that the defendant was "not similarly situated to an individual convicted under RICO." 649 N.W.2d at 839 (stating also that "[b]ecause we conclude that Frazier is not similarly situated to someone who violates RICO, we hold that the different penalties for violations of the [two statutes at issue] do not deny equal protection") (Anderson, Paul H., J., author).

nonpayment being mailed by the payee of the check. *Id.,* subds. 3(2)–3(3); *see also State v. Williams,* 324 N.W.2d 154, 159–60 (Minn.1982) (discussing permissive nature of this inference).

The theft-by-check statute, on the other hand, requires that the defendant issue a check knowing that she was not entitled to issue it. Minn.Stat. § 609.52, subd. 2(3)(i). Under this statute, the State is also required to prove that "the defendant, at the moment he issued the check, had the intention to defraud the other party by permanently depriving him of his property by never covering the check." *Williams,* 324 N.W.2d at 159; *see also* Minn.Stat. § 609.52, subd. 2(3). The theft-by-check statute does not contain a provision creating a permissible inference similar to the one in the dishonored-check statute indicating that the State can prove the requisite fraudulent intent based only upon the amount of funds in the defendant's account when the check was written or presented and the defendant's failure to pay the check within five days after notice of nonpayment was mailed. *See* Minn.Stat. § 609.52, subd. 2(3).

We next consider whether Cox's conduct in this case would support a conviction for theft by check. Cox's conduct must be determined from the record in this case, which consists of the facts alleged in the complaint. In the complaint, the State has alleged that Cox wrote five non-sequential checks to merchants in Benson, Minnesota between December 2, 2008, and December 27, 2008, that were returned to the merchants marked as "insufficient funds." The complaint further alleges that notices of nonpayment were mailed to Cox, beginning on January 6, 2009, and Cox did not pay the amount of the checks within five business days after the merchants mailed a notice of nonpayment to her. Three of the notices were returned as unclaimed.

Tellingly, Cox never asserted that the State could have charged her with theft by check. In fact, she claimed just the opposite. She specifically argued in her briefs to this court that "the propriety of charging under either statute is not at issue" and that she "has not argued that she was charged with the wrong statute." She further argued that she "is subject to a felony-level punishment for an act" of issuing worthless checks "that, if performed with a greater level of criminal intent, would otherwise subject her to a gross misdemeanor" under the theft-by-check statute. Thus, Cox contends she could be convicted of theft by check only if she had a more serious mens rea. Based on these statements, Cox essentially contends that she did not commit theft by check.

But even without these concessions, the facts alleged in the complaint would not support a conviction for theft by check.[8]

---

**8.** The dissent relies heavily on *State v. Bailey,* 263 Minn. 261, 266, 116 N.W.2d 548, 552 (1962), in which the court held there was probable cause to support a charge of felonious intent to defraud by aid of a check. The facts of *Bailey,* however, are significantly different from this case. In *Bailey,* the defendant and his friend approached a farmer on July 11, 1961, about buying some of his cattle. *Id.* at 263, 116 N.W.2d at 550. The farmer agreed to sell the defendant his cows for $4,100 after the defendant told him he had $2,700 in his pocket and that his brother would furnish the rest of the money by July 14. *Id.* at 263, 116 N.W.2d at 550. The farmer was also told all of the cows would be taken to pasture. *Id.* at 263, 116 N.W.2d at 550. On July 12, the defendant's friend took possession of the cows and gave the farmer a non-dated check from the defendant. *Id.* at 263, 116 N.W.2d at 550. The defendant then called the farmer and asked him to date the check for July 14. *Id.* at 263, 116 N.W.2d at 550. On July 14, the farmer saw some of the cattle being sold. *Id.* at 263, 116 N.W.2d at 550. The check was cashed on that same day and later returned for nonpayment. *Id.* at 263–64, 116 N.W.2d at 550. The court deter-

These facts would not establish that Cox had the specific intent to defraud any of the merchants when she wrote her checks, which is an element of theft by check. *See* Minn.Stat. § 609.52, subd. 2(3)(i). The facts are silent on whether Cox had adequate funds in her account at the time the checks were written. Instead, the facts relevant to Cox's mens rea are based entirely on events that occurred after all the checks were written, such as when the notices of nonpayment were sent and Cox's failure to pay the amount of the checks within five days of the mailing of the notices. The facts do not even demonstrate that Cox was aware of all the notices of nonpayment. In short, Cox has not demonstrated beyond a reasonable doubt that she is similarly situated to a person who commits theft by check because her conduct would not support a conviction for theft by check.

Because we conclude that Cox is not similarly situated to someone who violates the theft-by-check statute, we hold that the different penalties for violations of the theft-by-check statute and the dishonored-check statute do not deny Cox equal protection of the law.[9] Consequently, we answer the certified question in the negative.

Affirmed.

STRAS, J., concurring.

ANDERSON, PAUL H. and MEYER, JJ., dissenting.

PAGE, J., took no part in the consideration or decision of this case.

STRAS, Justice (concurring).

I join the court's opinion. However, given the lengthy and thoughtful dissent authored by Justice Paul Anderson, I write separately to make the following observation: our equal protection jurisprudence is inconsistent and confusing. As Justice Anderson points out, it is unclear whether equal protection challenges under the Minnesota Constitution are evaluated under the federal rational basis test or the three-part rational basis test that we apply in some cases but not others. Even when one test has been selected in a given case, our application of that test has been less than consistent.[10]

I suspect that some of the confusion in our equal protection case law is attribut-

mined that these facts established probable cause of an intent to defraud because they showed that "the complainant parted with property of the value of $4,100, for which he received a worthless check; and that the defendant *falsely represented* that the check would be honored on July 14." *Id.* at 266, 116 N.W.2d at 552 (emphasis added). Unlike this case, *Bailey* involved affirmative misrepresentations by the defendant and the defendant's sale of the property in a suspect manner shortly after he obtained that property. It was these additional acts, and not the mere issuance of a worthless check, that supported a reasonable inference that the defendant intended to defraud the farmer.

9. The situation in this case is unusual because the lesser-included offense of issuing a dishonored check is punished more harshly than the greater offense of theft-by-check in some circumstances. The fact that this is unusual, however, does not mean it violates the Equal Protection Clause of the Minnesota Constitution. It is up to the Minnesota Legislature to determine if this sentencing disparity should continue.

10. For instance, sometimes the court evaluates only the justification expressed by the legislature for a law, and at other times hypothetical justifications are evaluated. I agree with Justice Anderson that the better reading of our case law is that, when conducting rational basis review, the court may evaluate hypothetical justifications for a law. That approach is consistent with the federal rational basis test as well as our case law in other areas applying rational basis review.

able to the fact that the Minnesota Constitution, unlike the United States Constitution, makes no mention of equal protection rights. Instead, the origins of the equal protection right under the Minnesota Constitution seem to derive from Article I, Section 2, which states that "[n]o member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." *See Skeen v. State*, 505 N.W.2d 299, 302 (Minn.1993) (citing Article I, Section 2 of the Minnesota Constitution as the basis for the equal protection guarantee). Determining the nature of a right that is not specifically enumerated in the Minnesota Constitution is unsurprisingly a matter of some complexity and difficulty.

Nonetheless, it is our obligation to the coordinate branches of government to provide some clarity to our equal protection case law. The Minnesota Legislature needs guidance for when, and how, its laws will be evaluated for compliance with the equal protection right that the court has recognized under Article I, Section 2. Similarly, prosecutors must be able to recognize when the prosecution of certain individuals might violate equal protection. It is with these concerns in mind that I commend Justice Anderson for attempting to reconcile our equal protection case law, an undertaking I hope the court carries out in the future.

ANDERSON, PAUL H., Justice (dissenting).

I respectfully dissent. I disagree with the majority's conclusion that the sentencing disparity between Minn.Stat. § 609.535, subd. 2a(a)(1) (2010), and Minn. Stat. § 609.52, subd. 3(4) (2010), is constitutional as applied to the appellant, Diane Marie Cox. Laws that purport to address social goals that the Legislature believes to be important must have a rational basis, or else the Legislature runs the risk of having the law overturned because equal protection rights are violated. Here, I conclude that Minnesota's statutory scheme for punishing the practice of issuing dishonored checks does not have a rational basis as applied to Cox's actions.

Further, in reaching its decision to uphold Minnesota's statutory scheme as applied to Cox in this case, I conclude that the majority fails to resolve the inconsistencies in our equal protection case law, and incorrectly applies the test that it chooses to utilize. To resolve these inconsistencies, I would hold that the "similarly-situated" part of our rational basis review utilizes a threshold test, and that our three-part rational basis test applies once this threshold has been crossed. After applying these tests to the facts of this case, I would hold that Cox has not only met the threshold test, but has also established that the sentencing disparity between section 609.535 and section 609.52 does not satisfy our three-part rational basis test. Therefore, I would reverse the court of appeals.

Before articulating the legal analysis that underlies the reasons for my dissent, a brief review of some of the relevant facts of this case is in order. Diane Marie Cox is accused of issuing dishonored checks worth a total of $515.83 in violation of Minn.Stat. § 609.535, subd. 2 (2010). If convicted of this offense, she faces a maximum penalty of five years in prison, a $10,000 fine, and being labeled a felon for the rest of her life. Minn.Stat. § 609.535, subd. 2a(a)(1) (2010). Had Cox been charged with the more serious offense of theft by check[11]—an offense requiring the

---

**11.** We stated in *State v. Roden*, 384 N.W.2d 456, 458 (Minn.1986), that issuing a dishon-

State to prove that she had a higher degree of mens rea and that she obtained property or services from another in exchange for the dishonored checks—she would, if convicted, face a maximum penalty of one year in jail, a $3,000 fine, and have only a gross misdemeanor on her record. Minn.Stat. § 609.52, subds. 2(3)(i), 3(4) (2010). In essence, because Cox was charged with the less-serious crime—that is, the less-culpable and less-blameworthy crime—she faces a potentially greater punishment.

The State fails to justify this illogical punishment disparity, stating that the disparity may have been simply "inadvertence" by the Legislature in amending one of the statutes but not the other. But this alleged "inadvertence" has real-life consequences for Cox. It could result in a four year greater prison sentence, $7,000 more in fines, and impose upon her the label of a felon. Such a markedly different result does not have a rational basis.

## I.

I readily acknowledge that the development of equal protection case law by our court has been marked by some inconsistency. It also appears that these inconsistencies are being perpetuated by the majority's willingness to apply a test it derives from some of our cases, while at the same time, the majority either summarily dismisses or ignores several of our cases that dictate a different result.

The majority asserts that it is applying the similarly-situated test to deny Cox's equal protection challenge. We have previously used this similarly-situated test in several cases to deny equal protection claims. In *State v. Witt*, we stated that "[t]he sole limitation which the equal protection clause imposes upon the legislature

in the exercise of this power is that criminal statutes must not prescribe different punishments for the same acts committed under the same circumstances by persons in like situation." 310 Minn. 211, 215, 245 N.W.2d 612, 616 (1976) (citation omitted) (internal quotation marks omitted). We have repeatedly relied on comparable formulations of the similarly-situated test. In *State v. Frazier* we stated that "[a] statute violates the equal protection clause when it prescribes different punishments or different degrees of punishment for the same conduct committed under the same circumstances by persons similarly situated." 649 N.W.2d 828, 837 (Minn.2002). Earlier, in *State v. Dietz*, we stated that "[e]qual protection of the laws is not denied by a statute prescribing the punishment to be inflicted on a person convicted of crime, unless it prescribes different punishments for the same acts committed under the same circumstances by persons in like situation." 264 Minn. 551, 558, 119 N.W.2d 833, 837 (1963) (citation omitted) (internal quotation marks omitted).

We have, however, decided other equal protection challenges by applying a more robust test—a test that we have applied in equal protection cases since at least 1979. In these other cases, we have said that to satisfy rational basis review under an equal protection challenge pursuant to the Minnesota Constitution, a statute must meet each of the following parts of a three-part test:

> (1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the

ored check is a lesser-included offense of theft by check.

purpose of the law; that is, there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*Miller Brewing Co. v. State*, 284 N.W.2d 353, 356 (Minn.1979); *see also State v. Garcia*, 683 N.W.2d 294, 299 (Minn.2004) (applying the three-part test); *State v. Benniefield*, 678 N.W.2d 42, 46 (Minn. 2004) (same); *State v. Russell*, 477 N.W.2d 886, 888 (Minn.1991) (same).[12]

When applying the foregoing three-part test, we have said that we have "been unwilling to hypothesize a rational basis to justify a classification.... Instead, we have required a reasonable connection between the actual, and not just the theoretical, effect of the challenged classification and the statutory goals." *Russell*, 477 N.W.2d at 889. We have said that we have been "consistent" in applying this aspect of the three-part test, *id.*, and that this aspect was "[t]he key distinction between" the three-part test and the federal rational basis test. *Garcia*, 683 N.W.2d at 299. But, a thorough review of our case law shows just the opposite—there is a lack of consistency in applying the no-hypothetical-justifications aspect of our

three-part test. For example, in *Benniefield*, we made no mention of the requirement that we analyze the actual justification for the classification. *See* 678 N.W.2d at 46–47; *see also State v. Barnes*, 713 N.W.2d 325, 332–33 (Minn.2006) (making no mention of a requirement that the court only consider the actual justification for the classification).

To our credit, we have acknowledged that we have been inconsistent in applying the three-part test outlined above. In *Russell*, we stated that we have "not been consistent in explaining whether the rational basis standard under Minnesota law, although articulated differently, is identical to the federal standard or represents a less deferential standard under the Minnesota Constitution." 477 N.W.2d at 889. We noted that the federal standard for rational basis review requires "(1) a legitimate purpose for the challenged legislation, and (2) that it was reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose." *Id.* at 887. Unfortunately, acknowledging inconsistencies, but not resolving them, is not helpful to courts relying on us for guidance.

For more than twenty-five years, we have recognized inconsistencies in our

---

**12.** In some older cases, we applied a different test that appeared to combine aspects of the similarly-situated test and the post–1979 three-part test. This older test stated that equal protection "requires that a legislative classification apply uniformly to all those similarly situated; that the distinctions separating those who are included within the classification from those who are excluded are not arbitrary or capricious, but instead are real and substantial; and that the classification is consonant with a lawful purpose." *Kossak v. Stalling*, 277 N.W.2d 30, 34 (Minn.1979). But, this test has not been used by our court since the early 1980s, except that a slightly different version has been used specifically for equal protection challenges to classifications

created by workers' compensation statutes. In *Gluba ex rel. Gluba v. Bitzan & Ohren Masonry*, we articulated the test for workers' compensation statutes as follows: " 'To survive [an equal protection] challenge, a [workers' compensation] classification must apply uniformly to all those similarly situated; be necessitated by genuine and substantial distinctions between the two groups; and effectuate the purpose of the law.' " 735 N.W.2d 713, 721 (Minn.2007) (quoting *Bituminous Cas. Corp. v. Swanson*, 341 N.W.2d 285, 287 (Minn.1983) (alterations in original)). We stated that this test was different from the three-part test normally applied to equal protection challenges. *Id.* at 722–23.

equal protection case law, but have failed to resolve them. In 1985, we recognized that our three-part test for rational basis review may be a stricter standard than the federal rational basis standard and said the issue "deserves our careful consideration." *Bernthal v. City of St. Paul,* 376 N.W.2d 422, 424–25 (Minn.1985). But in *Bernthal,* we concluded that we should defer further analysis because resolution of the issue was not dispositive. *Id.* at 425. In 1993, Justice Esther Tomljanovich provided a "careful consideration," *id.* at 425, of this issue, but in a dissenting opinion. *See Mitchell v. Steffen,* 504 N.W.2d 198, 210 (Minn.1993) (Tomljanovich, J., dissenting). Since then, our court has merely acknowledged difficulties in our case law, but has done so without actually resolving these difficulties. *See Scott v. Minneapolis Police Relief Ass'n, Inc.,* 615 N.W.2d 66, 74 n. 15 (Minn.2000) (stating the three-part and federal rational basis tests "have raised questions concerning their applicability in different contexts," but not answering those questions); *see also Kolton v. Cnty. of Anoka,* 645 N.W.2d 403, 412 n. 5 (Minn.2002) (acknowledging that the applicability of the three-part and federal rational basis tests is unclear). Given the history of our equal protection jurisprudence, I find it problematic that the majority's analysis does not address why its similarly-situated test is the proper test as opposed to any of these other tests that we have also applied. I believe that we have an obligation to reconcile our case law so that Minnesota courts can apply a

consistent equal protection standard. Therefore, I will attempt such a reconciliation.[13]

### A.

As a starting point for this reconciliation, I conclude that the similarly-situated test applied by the majority to uphold the charge against Cox should be viewed as a threshold test. In other words, we should apply the similarly-situated test first to determine whether the challenge to the classification actually implicates equal protection rights. Only if the individual asserting a claim meets the similarly-situated test should the court ask whether the challenged classification can survive rational basis review. As the majority correctly notes, the similarly-situated test has not always been applied in equal protection cases. In both *Barnes* and *Russell,* we applied the three-part rational basis test without first applying the similarly-situated test. *See Barnes,* 713 N.W.2d at 332; *Russell,* 477 N.W.2d at 887–89. However, for the following reasons, I believe that treating the similarly-situated test as a threshold test is the correct way to approach an equal protection challenge.[14]

First, the general goal of the equal protection right is to ensure that similarly-situated individuals are treated similarly. In *Scott,* we stated that our equal protection analysis "begin[s] with the mandate that all similarly situated individuals shall be treated alike, but only 'invidious discrimination' is deemed constitutionally of-

---

13. This reconciliation is only necessary for equal protection challenges brought under the Minnesota Constitution. If the federal standard for analyzing equal protection challenges needs clarification, the federal courts should work on the clarification.

14. Federal case law supports this approach. *See, e.g., Keevan v. Smith,* 100 F.3d 644, 648 (8th Cir.1996) ("[T]he initial inquiry in any equal protection claim is whether the plaintiff has established that she was treated differently than others who are similarly situated to her."); *Klinger v. Dep't of Corr.,* 31 F.3d 727, 731 (8th Cir.1994) ("Absent a threshold showing that she is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim.").

fensive." 615 N.W.2d at 74 (citation omitted). Similarly, in *State by Spannaus v. Lutsen Resorts, Inc.*, we stated "[e]ssential to a ruling that equal protection has been denied by discriminatory administration of the laws is a finding that the persons treated disparately are similarly situated." 310 N.W.2d 495, 497 (Minn.1981). This goal of treating similarly-situated individuals similarly is mentioned in several cases applying the three-part test. *See, e.g., Garcia*, 683 N.W.2d at 298–99 (quoting the *Scott* language quoted above, but then outlining the three-prong test).

Second, when we apply the similarly-situated test to deny an equal protection challenge, we generally do not state the level of review we are applying. One step in deciding an equal protection challenge is to determine the applicable level of review. *See Greene v. Comm'r of Minn. Dep't of Human Servs.*, 755 N.W.2d 713, 725 (Minn.2008) ("We must determine whether to apply strict scrutiny or rational basis review to Greene's equal protection claim."). What level of review to apply will determine "the degree of deference to be accorded the legislative judgment when it creates classes treating persons within and without the class differently." *Mitchell*, 504 N.W.2d at 210 (Tomljanovich, J., dissenting). Once we determine the level of review—rational basis, strict scrutiny, or an intermediate level of scrutiny—we apply that level of review to the facts of the case. *See Greene*, 755 N.W.2d at 729.

When we apply the similarly-situated test to deny an equal protection challenge, however, we do not determine which level of review to apply, nor do we apply a level of review.[15] *See, e.g., Hale v. Viking Trucking Co.*, 654 N.W.2d 119, 125–26 (Minn.2002) (denying a would-be interve-

nor's equal protection violation argument without applying any level of review); *Frazier*, 649 N.W.2d at 837–39 (denying appellant's equal protection challenge without applying a level of review). This omission from our opinions indicates that the claim is being denied at a threshold level. Recently, Justice Alan Page agreed with this analysis in a concurring opinion, stating that "if the people are not similarly situated there is no equal protection claim in the first instance and there is no need to engage in a discussion about the appropriate standard of review and how that standard is to be applied." *Clayton v. Kiffmeyer*, 688 N.W.2d 117, 133 (Minn.2004) (Page, J., concurring).

Third, my research has uncovered no case from our court in which we applied only the similarly-situated test and then found an equal protection violation. Threshold tests are useful only in denying claims that lack merit; threshold tests are not useful in determining the validity of a claim once the claim passes this threshold. In other words, once claimants meet the similarly-situated test and get past this threshold, courts need to apply some level of review to determine the merits of the claim. The lack of cases applying the similarly-situated test to find an equal protection violation supports the notion that the test is a threshold test.

Finally, the similarly-situated test has been used as a threshold test in at least one of our prior cases. In *Garcia*, we considered whether equal protection rights were denied by granting different jail time credits to juveniles certified as adults who violated probation and juveniles certified as extended jurisdiction juveniles who violated probation. 683 N.W.2d at 298. As part of our analysis, we outlined the vari-

---

**15.** The majority's opinion in this case reinforces this point. The similarly-situated test is used by the majority to deny the equal protection claim before the majority identified a level of review or applied that level of review.

ous rational basis tests we had used in the past, and decided we would use the three-part test. *Id.* at 298–99. Next, we stated that "[w]e first must consider the state's argument that juveniles and adults are not similarly situated for equal protection purposes." *Id.* at 299. Because we concluded that individuals in the two classifications were similarly situated, we proceeded to "consider whether, on the facts presented, there is a rational basis" for the distinction in granting jail credits. *Id.* We then applied the three-part test to determine whether the State's classification met rational basis review. *Id.* at 299–301. In other words, in *Garcia*, we applied the similarly-situated test as a threshold test. Finding the threshold test satisfied, we then applied our three-part test used for rational basis review.

### B.

As previously noted, there is our three-part rational basis test as well as a federal version of the rational basis test for equal protection challenges. Our current three-part test states the following:

(1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classifica-

tion must be genuine or relevant to the purpose of the law; that is there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; and (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*Russell,* 477 N.W.2d at 888. The federal rational basis test states that "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

We have applied our three-part test to equal protection claims under the Minnesota Constitution since 1979.[16] At times, however, we have applied the federal rational basis test to such claims. For example, in *State v. Behl,* we analyzed an equal protection challenge to a sentencing disparity based solely on whether a juvenile was indicted, but not convicted, of first-degree murder. 564 N.W.2d 560, 568–69 (Minn.1997). In *Behl,* we did not mention our three-part test when applying the federal rational basis test.[17] *Id.* at 568; *see also Lidberg v. Steffen,* 514 N.W.2d 779, 784 (Minn.1994) (applying the federal rational basis test to an equal protection challenge for different commitment discharge procedures).

16. *See, e.g., Greene v. Comm'r of Minn. Dep't of Human Servs.,* 755 N.W.2d 713, 729–30 (Minn.2008); *State v. Barnes,* 713 N.W.2d 325, 332 (Minn.2006); *State v. Benniefield,* 678 N.W.2d 42, 46 (Minn.2004); *Westling v. Cnty. of Mille Lacs,* 581 N.W.2d 815, 820 (Minn.1998); *State v. Russell,* 477 N.W.2d 886, 888 (Minn.1991); *McGuire v. C & L Rest. Inc.,* 346 N.W.2d 605, 612 (Minn.1984); *Thompson v. Estate of Petroff,* 319 N.W.2d 400, 404 (Minn.1982); *Wegan v. Vill. of Lexington,* 309 N.W.2d 273, 280 (Minn.1981);

*Miller Brewing Co. v. State,* 284 N.W.2d 353, 356 (Minn.1979).

17. It is not obvious from our opinion in *Behl* whether we were applying the federal rational basis test to an equal protection challenge under the U.S. Constitution or the Minnesota Constitution. The appellant in *Behl* did not cite to either constitution in his equal protection argument, but he did cite to the constitutional law portion of *Dunnell Minnesota Digest,* indicating a challenge brought under the Minnesota Constitution.

Justice Tomljanovich, in her dissenting opinion in *Mitchell*, suggested that the three-part test outlined in *Russell* be reserved as an intermediate level of review to be applied only when there is a semi-suspect class, or when a facially neutral statute has a disparate impact on a suspect class, as was the case in *Russell*. 504 N.W.2d at 210 (Tomljanovich, J., dissenting). To support this suggestion, Justice Tomljanovich pointed to three cases decided shortly after *Russell* that applied the federal rational basis test, which indicated to her that the three-part test was not our default test for rational basis review. *Id.* Since Justice Tomljanovich's dissent in *Mitchell*, however, we have applied the three-part test in several cases that do not implicate a semi-suspect class or a disparate impact on a suspect class. In *Barnes*, we applied the three-part test to an equal protection challenge based on disparate treatment under a domestic abuse murder statute. 713 N.W.2d at 332–33. In *Benniefield*, we applied the three-part test to a case challenging a sentencing disparity between possessing drugs inside a school zone and possessing drugs outside a school zone. 678 N.W.2d at 45–47. Also, as previously noted, we applied the three-part test in *Garcia*, a case involving different jail time credits given to juveniles certified as adults and juveniles certified as extended jurisdiction juveniles. 683 N.W.2d at 296, 298–301. These cases indicate that since *Russell* we have developed and applied our three-part test as the default test for rational basis review in equal protection cases under the Minnesota Constitution. Therefore, I conclude that based on our most relevant case law, we should apply the three-part test to equal protec-tion challenges brought under the Minnesota Constitution that warrant rational basis review and meet the similarly-situated threshold test.[18]

## C.

The next question to be addressed as part of my attempt to reconcile our equal protection case law is whether our three-part rational basis test allows us to consider hypothetical justifications for the classifications challenged in an equal protection case, or whether we must look exclusively to the Legislature's actual justification(s). The federal test states that a statutory classification will survive rational basis review "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). I would conclude that when applying our three-part rational basis test, we may look to hypothetical justifications for the statute, just as in the federal test.

*Purported case law basis for the no-hypothetical-justifications requirement is unfounded*

In *Russell*, we stated that we have "been consistent" in requiring that courts analyze "the actual, and not just the theoretical" justification for a challenged classification. 477 N.W.2d at 889. For support, we then cited to a William Mitchell Law Review article from 1984 that discusses three of our cases. *Id.* (citing Deborah K. McKnight, *Minnesota Rational Relation Test: The* Lochner *Monster in the 10,000 Lakes*, 10 Wm. Mitchell L.Rev. 709 (1984))[19]; *see also In re Estate of Turner*,

18. Cox only argues for us to apply the rational basis test. Therefore, this dissent is focused exclusively on cases that apply a rational basis test, and takes no position on when we should apply strict or intermediate scrutiny.

19. Specifically, we cited to McKnight's discussion of the following cases: *Wegan v. Vil-*

391 N.W.2d 767, 772 (Minn.1986) (Wahl, J., concurring) (citing the same cases and article for the same proposition). I disagree that our cases require us to consider only the actual justification for the challenged statute.

In *Russell,* we first cited to *Wegan v. Village of Lexington,* 309 N.W.2d 273 (Minn.1981), for the proposition that we assess the actual justification for a challenged classification. *Russell,* 477 N.W.2d at 889. *Wegan* involved a disparity in the Dram Shop Act between the limitations period applicable to individuals suing retailers that sold beer with less than 3.2% alcohol ("non-intoxicating" liquor retailers), and all other liquor retailers ("intoxicating" liquor retailers). 309 N.W.2d at 277–78. A plaintiff suing an intoxicating liquor retailer for injuries had one year to commence an action under the Dram Shop Act, whereas a plaintiff suing a non-intoxicating liquor retailer under common law had six years to commence an action. *Id.* We held that this time disparity violated equal protection. *Id.* at 281.

In deciding *Wegan,* we applied our three-part test for rational basis review. *Id.* at 280. We concluded that there was a legitimate purpose to the statute (part 3 of our test), but concluded that the distinction between the two types of liquor retailers was arbitrary (part 1), and that the state's classification of the retailers was not relevant to the purpose of the Dram Shop Act (part 2). *Id.* We then held the classification to be arbitrary because it did not matter which type of alcohol was used to intoxicate a person when a plaintiff was injured by an intoxicated person. *Id.* In *Wegan,* we did not discuss hypothetical justifications for the classification. *See id.* at 280–81. McKnight argues this lack of

any discussion of hypothetical justifications for the statute shows a departure from the federal version of rational basis review because under our three-part test, we only considered the actual justification for the challenged statute. McKnight, *supra,* at 726. I believe this argument is, at best, a reach, and at worst, unfounded.

What I find important in our *Wegan* opinion is that we did not state that we were only considering the actual justification for the statute. Nor did we state that future courts may not consider hypothetical justifications for statutes when applying our three-part test. Therefore, while I agree that our three-part test arguably sets a different standard than the federal rational basis test, I cannot agree with McKnight that *Wegan* indicates that our three-part test requires us to consider only the actual justifications for a classification.

McKnight also points to our footnote in *Wegan,* which states that even if the statute was constitutional under the U.S. Constitution, the statute would still be unconstitutional under the Minnesota Constitution. This footnote indicates that the three-part test we used in *Wegan* may provide a different standard than the federal rational basis test; but, the footnote does not indicate that the basis for this different standard was refusing to provide a hypothetical justification for a challenged classification. I conclude that the lack of a discussion of a hypothetical justification for the challenged statute and our footnote in *Wegan* do not signify that we may consider only the actual justification for the statute.

In *Russell,* we also cited *Nelson v. Peterson,* 313 N.W.2d 580 (Minn.1981), to support the notion that we may look only

*lage of Lexington,* 309 N.W.2d 273 (Minn. 1981), *Nelson v. Peterson,* 313 N.W.2d 580 (Minn.1981), and *Thompson v. Estate of Pe-*

*troff,* 319 N.W.2d 400 (Minn.1982). *Russell,* 477 N.W.2d at 889.

to the actual justification for a challenged classification. *Russell,* 477 N.W.2d at 889. In my view, not only is this view of *Nelson* erroneous, our decision in *Nelson* may actually support the opposite conclusion. In *Nelson,* we considered a challenge to a statute that prohibited attorneys from becoming workers' compensation judges if the attorney worked for the workers' compensation division and represented employees. 313 N.W.2d at 580–81. Despite this prohibition, the statute allowed attorneys to become workers' compensation judges if they worked for the division and represented the State. *Id.* at 581. In deciding that the statute violated equal protection rights, we considered hypothetical justifications for the statute, not just actual justifications provided by the Legislature. More specifically, we considered the State's arguments about what the Legislature "may have legitimately believed," and what the Legislature "could have believed" in enacting the statute at issue. *Id.* at 582–83 (internal quotation marks omitted). Moreover, we rejected a rationale for the law that we supplied. *See id.* at 582. Therefore, in *Nelson,* we considered hypothetical justifications for the statute raised by the parties and we supplied a hypothetical justification of our own. But after doing so, we simply dismissed these justifications as failing rational basis review.

The final case cited by *Russell* to support the proposition that we may not supply a hypothetical justification for a challenged classification is *Thompson v. Estate of Petroff,* 319 N.W.2d 400 (Minn.1982). In *Thompson,* the defendant and the deceased had an altercation, and the deceased attacked, raped, and threatened to kill the defendant. *Id.* at 401. The defendant killed the deceased during the attack, and was subsequently acquitted of a murder charge brought against her. *Id.* The defendant then brought an action against the deceased's estate, seeking the recovery of damages resulting from the assault. *Id.* The district court dismissed the defendant's action on the ground that the survival statute did not allow intentional tort claims to survive the perpetrator's death, but did allow other types of claims to survive. *Id.* at 402. In *Thompson,* we applied the same three-part test utilized in *Wegan* and *Nelson* when we held that the omission of intentional torts from the survival statute violated equal protection. *See id.* at 404.

There are two reasons I believe that *Thompson,* like *Wegan* and *Nelson,* does not stand for the proposition that we may not consider hypothetical justifications for a classification. First, in *Thompson,* the decedent's estate argued that the omission of intentional torts from the survival statute was based on the difficulty for the estate to defend against an accusation of intent without the perpetrator's point of view. *Id.* The estate cited to no legislative source to support this argument.[20] We considered the estate's argument, even though it was not necessarily the actual justification for the classification drawn by the statute. *See id.* Second, in *Thompson,* we stated that we "regard[ed] the rational basis test as the same under both" the Minnesota and U.S. Constitutions. *Id.* at 406 n. 10. Therefore, in *Thompson* we implicitly disclaimed any sort of heightened standard in which a hypothetical justification would not suffice.

The foregoing analysis illustrates that the three cases cited in *Russell* do not provide adequate support for the notion

---

**20.** Respondents cited to legislative history only to show that the Legislature declined to add intentional torts to the survival statute. When discussing the rational basis for the Legislature's decision, no legislative sources were cited.

that we may not supply a hypothetical justification for a statute when reviewing an equal protection claim under rational basis review. Therefore, I conclude that there is support for using hypothetical justifications in conducting rational basis review of legislative classifications.

*Inconsistency in application*

There are additional reasons why, when applying rational basis review to statutes facing constitutional challenges, we may provide hypothetical justifications for the statute. The three-part rational basis test we apply to equal protection challenges has a basis in our Uniformity Clause jurisprudence. *See Miller Brewing Co.,* 284 N.W.2d at 356 & n. 3. Yet tax cases that implicate the Uniformity Clause and equal protection rights do not require that we consider only the actual justification for a challenged classification. In *Council of Independent Tobacco Manufacturers of America v. State,* a case addressing both a Uniformity Clause and an equal protection challenge, we stated that

> in analyzing the purpose of the classifications created by the statute, we are not restricted to those purposes expressly stated by the legislature. Rather, *any* legitimate purpose can support the classifications created by the statute.

713 N.W.2d 300, 310 (Minn.2006). Similarly, when analyzing substantive due process claims under rational basis review, we do not require the actual justification be used. *See Boutin v. LaFleur,* 591 N.W.2d 711, 717–18 (Minn.1999) (citing a U.S. Supreme Court case considering a federal equal protection issue to outline the rational basis test we applied to a substantive due process claim).

Moreover, the justification for treating tax cases under the Uniformity Clause differently from other equal protection challenges is illogical. We have said that courts should be deferential to the Legislature in tax legislation because "taxation policy is peculiarly a legislative function, involving political give-and-take." *Minn. Automatic Merch. Council v. Salomone,* 682 N.W.2d 557, 561–62 (Minn.2004) (citation omitted) (internal quotation marks omitted). Our explanation for the exception in tax cases could apply to almost all legislation enacted by the Legislature. Establishing the elements of a crime and the levels of punishment are also "peculiarly a legislative function," just as is tax legislation. *See State v. Olson,* 325 N.W.2d 13, 17–18 (Minn.1982) ("The power to define the conduct which constitutes a criminal offense and to fix the punishment for such conduct is vested in the legislature.").

Additionally, we have supplied a hypothetical justification for a classification in an equal protection challenge to a sentencing disparity case decided after *Russell.* In *Behl,* we considered an equal protection challenge to a sentencing disparity based on whether a juvenile was indicted, but not convicted, with first-degree murder. 564 N.W.2d at 568–69. We made no mention of our three-part test when applying the federal rational basis test. In applying the federal test, we stated that "[a]lthough the state failed at oral arguments to assert a rational basis upon which to base this different treatment," the grand jury's finding of probable cause supplied a rational basis. *Id.* at 569.

These inconsistencies, occurring in other circumstances involving constitutional challenges to statutes, support a conclusion that we may supply hypothetical justifications for classifications created by a challenged statute.

*Separation of powers issues*

There is another and more fundamental reason why I believe we must discontinue our refusal to allow courts to consider

hypothetical justifications for classifications in equal protection cases. I conclude that requiring the Legislature to justify every piece of legislation, or else be subject to an equal protection challenge, offends the notion of separation of powers. To use the "actual" justification for the statute, we would need to look to the legislative record and parts of the statute itself. Requiring a justification for any classification appears to relegate the legislative and executive branches to a position inferior to the courts, requiring these branches to justify any classifications they create or else face being overruled. Rather, such a result violates well-established separation of powers principles. Legislative and executive branches have the power to work within the confines of the Minnesota and U.S. Constitutions and to make their own policy judgments, without having to justify non-suspect classifications to the courts.

Based on the foregoing multi-part analysis, I would conclude that in most equal protection cases we do not prohibit the consideration of hypothetical justifications for classifications when applying rational basis review.[21] I see no reason for us to continue to refuse to utilize and assess hypothetical justifications for classifications facing rational basis review. Accordingly, to the extent that our three-part test has been distinguished from and viewed to establish a higher standard than the federal test based on a prohibition on considering hypothetical justifications, I conclude that such a distinction lacks merit.

### D.

The preceding analysis outlines what I believe to be the proper approach to deciding an equal protection challenge under the Minnesota Constitution. I concede that my analysis does not reconcile every single case in our equal protection jurisprudence, but I believe such a total reconciliation of all of our disparate cases is not possible and, at this point, not necessary. As part of our obligation to the people of Minnesota, we must provide clear guidance on how individuals may vindicate their equal protection rights under the Minnesota Constitution. The test we apply may, if Cox is convicted of the charged offense, be the difference between whether Cox is branded as a felon or a gross misdemeanant; whether the State retains the ability to put Cox in prison for a maximum term of five years or one year; and whether the State may fine Cox an additional $7,000. The stakes in this case, and in similar cases, are too high for us to make a mistake about the proper test to apply.

To summarize, the approach to equal protection cases (other than those involving a disparate impact on race, as in *Russell*) that best reconciles our case law is as follows: First, we generally apply the similarly-situated test as a threshold test so that only claims that actually invoke equal protection concerns are reviewed. Second, we apply our three-part rational basis test rather than the federal version of the rational basis test. Our three-part test asks different questions than the federal rational basis test, and should be applied by the courts as it has been outlined in our recent opinions. Finally, we may assess hypothetical justifications in support of legislative classifications.

---

**21.** In *Russell,* we dealt with a statute that had a disparate impact based on race. We concluded that it was "particularly appropriate that we apply our stricter standard of rational basis review in a case such as this where the challenged classification appears to impose a substantially disproportionate burden on the very class of persons whose history inspired the principles of equal protection." *Russell,* 477 N.W.2d at 889. I would leave our *Russell* opinion undisturbed as applied to cases alleging a disparate impact based on race.

## II.

Having articulated what I conclude to be the appropriate approach to be used by our court in equal protection challenges under the Minnesota Constitution, the next step is to apply this approach to the facts of the case before us. I begin, as the majority did, by applying the similarly-situated test. But, I conclude that the majority has incorrectly applied the similarly-situated threshold test. The majority incorrectly requires Cox to prove she is similarly situated with people convicted of theft by check, even though Cox should only be required to prove that she is similarly situated with people charged with theft by check. Therefore, the majority applies a standard that is too stringent.

### A.

To succeed in her challenge, Cox must prove beyond a reasonable doubt that the Legislature violated the Minnesota Constitution by treating similarly-situated individuals differently without a rational basis. *See Schober v. Comm'r of Revenue*, 778 N.W.2d 289, 293 (Minn.2010) (stating constitutional violations must be proven beyond a reasonable doubt). At this point in the proceedings, it is unclear whether Cox could be convicted under either statute and Cox is innocent of all charges until proven guilty. Therefore, to meet the similarly-situated test, Cox must prove beyond a reasonable doubt that she is capable of being charged with theft by check. Prior cases involving challenges to punishment schemes required individuals convicted of one crime to prove they are similarly situated with individuals convicted of another crime. In *Frazier*, for example, the appellant had pleaded guilty to a crime with a more severe punishment and we concluded he was not similarly situated to individuals convicted of a crime with a less-severe punishment. 649 N.W.2d at 830, 839. Here, Cox is only charged with a crime

that carries a more severe punishment, and we should therefore compare her with individuals charged with a crime that carries a less severe punishment. To require that Cox prove she could be convicted of theft by check would essentially require Cox to prove her own guilt of issuing a dishonored check before trial has commenced.

To prove Cox was similarly situated to those charged with theft by check, she must show that there was probable cause to support a charge of either theft by check or issuing a dishonored check. *See* Minn. R.Crim. P. 2.01, subd. 4. I will apply the differences between the elements of theft by check and issuing a dishonored check to the facts alleged in the complaint in order to decide whether Cox could have been charged with either crime. I conclude that Cox can show, beyond a reasonable doubt, that the State had probable cause to charge Cox under either statute based on the facts in the complaint and thus, Cox faces the punishment imposed under either statute.

### Mens rea

The first difference between the two statutes is the mens rea requirements. The theft-by-check statute requires that a defendant issue a check with the "intent to defraud," whereas the dishonored-check statute requires that a defendant issue a check that he or she "intends ... not be paid." Minn.Stat. §§ 609.52, subd. 2(3), 609.535, subd. 2. The dishonored-check statute lists permissible inferences that are sufficient to show that the defendant intended the checks not be paid, whereas the theft-by-check statute does not list these inferences to determine intent to defraud. Intent "generally is proved circumstantially, by inference from words and acts of the actor both before and after the incident." *State v. Johnson*, 616

N.W.2d 720, 726 (Minn.2000). The majority states that the facts alleged in the complaint do not support Cox's as-applied challenge because the allegations would not support a conviction. But, as illustrated earlier, the majority should be analyzing whether there is probable cause to support a charge of theft by check, not whether the facts in the complaint support a conviction of theft by check.

In *State ex rel. Hastings v. Bailey,* the defendant challenged whether there was probable cause to support a charge of felonious intent to defraud by aid of a check. 263 Minn. 261, 262–63, 116 N.W.2d 548, 549–50 (1962). The facts in the record showed that the defendant agreed to purchase cattle for more money than he currently possessed. *Id.* at 263, 116 N.W.2d at 550. He told the seller that his brother would give him the remainder, and he gave the seller a check asking that the seller post-date it. *Id.* at 263, 116 N.W.2d at 550. When the seller cashed the check, there were insufficient funds. *Id.* at 263–64, 116 N.W.2d at 550. Additionally, the defendant said he would take the cattle to pasture, but the seller saw the cattle being resold. *Id.* at 263–64, 116 N.W.2d at 550. We held that probable cause was shown because

> the evidence established that the complainant parted with property of the value of $4,100, for which he received a worthless check; and that the defendant falsely represented that the check would be honored on July 14. The evidence also established that instead of pasturing the cattle the defendant sold all or part of them and kept the proceeds.

*Id.* at 266, 116 N.W.2d at 552.

In the case before us, the allegations facing Cox are sufficient to show probable cause for intent to defraud just as they were in *Bailey.* Cox allegedly received property in exchange for checks, and, by giving the check to the retail stores, she impliedly represented that the check would be paid when presented to the bank. *See id.* at 264–65, 116 N.W.2d at 550–51. Additionally, Cox allegedly went to the same store two days in a row to spend nearly $350, which could indicate a plan to exploit businesses that allowed her to purchase merchandise with worthless checks. This alleged two-day shopping spree took place at the end of the month, after she had already allegedly issued three worthless checks at other retail outlets. Finally, all five of the worthless checks identified in the complaint were given to retail stores in exchange for merchandise—none of the allegedly worthless checks were used to pay for bills.[22] This consistency in only passing worthless checks to retail stores tends to show an intent to defraud, rather than simply a budgetary mistake. *See City of St. Paul v. Greene,* 238 Minn. 202, 204, 56 N.W.2d 423, 424–25 (1952) (stating that "a system of successive forgeries or of successive cheats or swindles of the same general nature" is admissible to show "that the defendant had been engaged in practicing like or similar cheats, as tending to prove a criminal intent" (citation omitted) (internal quotation marks omitted)). All of these allegations show that the State had probable cause to charge Cox with either offense.

*Obtaining property or services*

The next difference between the statutes is the requirement in the theft-by-check statute that the defendant obtains possession, custody, or title to property of another or obtains services from another. This

---

**22.** The complaint alleges Cox passed worthless checks numbered 1151, 1159, 1163, 1164, and 1165 on the same account. Therefore, presumably, there were at least eleven other checks issued by Cox during December that were paid or not reported.

requirement in the theft-by-check statute is not contained in the dishonored-check statute. In this case, the complaint alleges that Cox did receive possession, custody, or title to property of another because she allegedly used her checks at retail stores "as payment for merchandise." Because the complaint does allege Cox obtained possession, custody, or title to property of another, she could have been charged under either statute.

*Value of property or services obtained*

Finally, the proof of dollar value is different under the two statutes. The theft-by-check statute bases punishment on the value of the goods or services obtained, whereas the dishonored-check statute bases punishment on the dollar amount of the check. I conclude that this element is inconsequential when applied to the facts of this case. Issuing dishonored checks "as payment for merchandise" at retail stores [23] will presumably provide the issuer with goods of a value equal to the amount on the check. *See* Minn.Stat. § 609.52, subd 1(3) (2010) (defining "value" for the theft-by-check statute as "the retail market value at the time of the theft").

*Case law relied on by the majority is distinguishable*

The majority compares this case to *Frazier* and *Dietz* in concluding that Cox is not similarly situated to those individuals convicted of theft by check. *See State v. Frazier*, 649 N.W.2d 828 (Minn.2002); *State v. Dietz*, 264 Minn. 551, 119 N.W.2d 833 (1963). I conclude that these comparisons are inapposite.

In *Frazier*, we considered the defendant's as-applied challenge to the statute, and we stated that "the critical inquiry is whether the elements" of the two statutes were "the same or essentially similar."

649 N.W.2d at 837. This quoted passage appears to reinforce the majority's application of the similarly-situated test that looks to the general elements of each crime. *Frazier*, however, is distinguishable because in that case it was impossible to convict the defendant under both statutes. In *Frazier*, the punishment disparity was based on the number of predicate criminal acts committed by a defendant. *Id.* at 839. Minnesota law criminalized committing a crime for the benefit of a gang, and required only one predicate criminal act. *See Frazier*, 649 N.W.2d at 839 (citing Minn.Stat. § 609.229 (2000)). The RICO statute, on the other hand, criminalized a pattern of criminal activity, and required the State to prove at least three predicate criminal acts. *Id.* In *Frazier*, the defendant was convicted under section 609.229 based on his commission of one predicate criminal act. 649 N.W.2d at 839. Therefore, we stated that the defendant "is not similarly situated to an individual convicted under RICO, whose conviction must be based on his participation in at least three criminal acts." *Id.* Here, unlike in *Frazier*, the allegations in the complaint are sufficient to show that Cox could have been charged under either statute, and therefore Cox is similarly situated with individuals charged under either statute.

In *Dietz*, the punishment disparity challenged by the defendants was based on the dollar value of the property stolen. 264 Minn. at 558–59, 119 N.W.2d at 837–38. In *Dietz*, the punishment for stealing property worth less than $25 from an automobile at night was greater than the punishment for stealing property worth between $25 and $100 from an automobile at night. *Id.* at 554, 119 N.W.2d at 835. The defendants in *Dietz* were charged with stealing property worth less than $25 from an auto-

---

**23.** Cox allegedly issued dishonored checks at Benson Liquor Store, Darold's Super Valu, Kelly's Convenience Store, and Running's Farm & Fleet.

mobile at night. *Id.* at 552, 119 N.W.2d at 834. Under the statutory scheme, the defendants' actions could be subject only to the punishment attached to one level of theft, but not any of the others. Therefore, the defendants in *Dietz* could only be charged with the act of stealing property worth less than $25, and could not be charged with the act of stealing property worth between $25 and $100. Therefore, the defendants were not similarly situated with others who were charged with stealing property worth between $25 and $100. In this case, unlike in *Dietz*, Cox's alleged acts could lead to charges under either statute.

Based on the preceding analysis, I would conclude Cox is similarly situated with individuals charged with either theft by check or with issuance of a dishonored check. Therefore, I would hold that Cox meets the similarly-situated threshold test, and I would proceed to apply rational basis review to her equal protection challenge.

### B.

Having established that Cox is similarly situated to those individuals charged with either theft by check or issuing a dishonored check, I now apply our rational basis test. The three-part rational basis test we apply under the Minnesota Constitution requires the following:

> (1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classifica-

tion must be genuine or relevant to the purpose of the law; that is there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; and (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*Russell*, 477 N.W.2d at 888. I would conclude that the punishment disparity between the dishonored-check statute and the theft-by-check statute meets part 1 of our three-part test, but cannot meet part 2 of that test. Because part 2 of our test cannot be met, there is no need to address part 3.

#### Part 1

The first question is whether the distinction between individuals charged with committing theft by check and individuals charged with issuing a dishonored check is "manifestly arbitrary or fanciful" or whether there is a "genuine and substantial" distinction between the two groups. As earlier noted, there are three differences between the two offenses—mens rea, proof of obtaining property or services, and the method of determining the punishment level. These distinctions between the two groups are not arbitrary or fanciful, but provide a "natural and reasonable basis to justify" differing treatment of the groups. The Legislature is certainly free to treat a more-culpable mens rea differently than a less-culpable mens rea. Also, the Legislature could reasonably believe that people who use false checks to obtain property or services deserve different treatment than those who use false checks and receive nothing additional in return.[24] Therefore, I conclude the stat-

---

24. Although I concluded that the allegations against Cox provide probable cause to meet the requirements of both statutes, this conclusion does not mean that the classification drawn by the statutes is manifestly arbitrary or fanciful. The distinction drawn by the statutes is a genuine and substantial difference relevant to a defendant's culpability. The ability to charge Cox with either offense

utes meet the first part of our three-part rational basis test.

*Part 2*

The next question is whether the classification is "genuine or relevant to the purpose of the law." The purposes of the criminal code are to prevent crime with deterrence, to rehabilitate the convicted, to confine the convicted when required, and

> to protect the individual against the misuse of the criminal law by fairly defining the acts and omissions prohibited, authorizing sentences *reasonably related to the conduct and character of the convicted person,* and prescribing fair and reasonable postconviction procedures.

Minn.Stat. § 609.01 (2010) (emphasis added). We have held that issuing a dishonored check is a lesser-included offense of theft by check. *State v. Roden,* 384 N.W.2d 456, 458 (Minn.1986). By providing a greater punishment for the lesser-included offense, the Legislature renders the classification irrelevant to the purpose of providing sentences that are reasonably related to the conduct charged. This punishment scheme turns the notion of lesser-included and greater-included offenses on its head and could lead to arbitrary charging decisions by the State. Moreover, the Legislature's purpose in creating separate crimes for greater and lesser offenses is not served. Additionally, the Legislature is failing to deter more-culpable criminal acts by removing any incentive to not commit the greater offense instead of the lesser offense. The State did not provide adequate justification for this result, and I cannot conceive of any rational hypothetical reason that would prompt the Legislature to desire this outcome. A mistake or inadvertence, the only basis for the sentencing disparity advanced by the State, is not a reasonable basis for the classification. Therefore, I conclude that the classification is irrelevant to the purpose of the law, and that therefore, the punishment disparity between the theft-by-check statute and the dishonored-check statute as applied to Cox is a violation of equal protection.

*Part 3*

Because I conclude that the classification is not relevant to the purpose of the law, I do not need to address part 3 of our three-part rational basis test—whether the purpose of the law is legitimate.

*Additional Support*

My conclusion that Cox has asserted a valid equal protection challenge to the dishonored-checks/theft-by-check statutes is supported by our decision in *State v. Garcia,* 683 N.W.2d 294 (Minn.2004). In *Garcia,* as previously noted, a statute provided different rules for whether an individual would receive jail credit for time served based on the individual's certification as an adult, or certification as an extended jurisdiction juvenile ("EJJ"). *Id.* at 298. EJJs who violated probation would not receive certain jail credit that would be given to juveniles certified as adults who subsequently violated their probation. *Id.* at 297–98. We held that this disparity was not rational. *Id.* at 301. The reason for the disparity provided by the State was that a greater punishment was given to EJJs because EJJs are more amenable to treatment, and the threat of a longer prison sentence would be helpful. *Id.* at 299–300. We concluded that there was no rational basis for this distinction, because the purpose of probation is the same for all of juveniles on probation. *Id.* at 300. Therefore, we stated that "it is not rational, under these circumstances, to punish juveniles designated as EJJs more severely than juveniles certified as adults who engage in the same conduct." *Id.*

does not mean that the distinction between the offenses is arbitrary.

Here, I also conclude there is no rational reason to punish a person who violates the dishonored-check statute more harshly than a person who violates the theft-by-check statute. The facts of this case present a stronger case for an equal protection challenge than the facts in *Garcia*. In *Garcia*, we held that the purpose of probation for both groups was to incentivize individuals to abide by the rules, and there was no reason to provide one group with a greater incentive. But here, there is a reason to provide a harsher penalty for one group because one crime is the lesser-included offense of the other. But, the Legislature did the complete opposite.

For all the foregoing reasons, I conclude that the sentencing disparity between the theft-by-check statute, Minn.Stat. § 609.52, subd. 3(4), and the dishonored-check statute, Minn.Stat. § 609.535, subd. 2a(a)(1), is a violation of equal protection. Therefore, I would answer the certified question in the affirmative, and reverse the court of appeals.

MEYER, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.